UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAUL DUVAL,<br>                    Plaintiff,<br><br>vs.<br><br>THE TOP-FLITE GOLF COMPANY,<br>                    Defendant. | CIVIL ACTION NO. 05-30181-KPN<br><br>AFFIDAVIT OF PETER A. ARTURI IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

I, Peter A. Arturi, under the pains and penalties of perjury, do hereby state as follows:

1. This affidavit is based on first-hand information, except to the extent that it reflects details, produced during discovery, that were gleaned from normally maintained business records, such as personnel files, financial records and production figures.

2. I commenced employment with Spalding Sports Worldwide, Inc. (hereinafter "Spalding"), then a wholly-owned subsidiary of Spalding Holdings Corporation (hereinafter "SHC") headquartered in Chicopee, Massachusetts, in October, 1998. Shortly thereafter I was named Vice President, General Counsel and Secretary, and also became part of the senior management team involved in the management of the company. I occupied that position from 1999 until Spalding sold off a large portion of its business in 2003, renamed itself, filed for bankruptcy, and then sold off the remainder of its business pursuant to an order of the bankruptcy court.

    When I commenced employment, Spalding was involved in the production, distribution, marketing and sale of golf-related products (golf balls, golf clubs, golf shoes and golf gloves under the SPALDING, TOP-FLITE, BEN HOGAN and ETONIC brands), inflatable sporting goods (basketballs, footballs, soccer balls and volleyballs under the SPALDING brand), and softballs under the DUDLEY brand.

3. I was also involved in the bankruptcy proceedings, as well as discussions with companies interested in bidding on the assets of the former company in the bankruptcy proceedings.

4. On September 15, 2003, I became an employee of The Top-Flite Golf Company (hereinafter "TFGC"), which is a wholly owned subsidiary of Callaway Golf Company. I have been General Counsel and part of TFGC's senior management team since its creation in September 2003.

5. From the time I joined Spalding through 2003, Spalding employed approximately one thousand individuals at its Chicopee headquarters, and many others at its wholly-owned foreign subsidiaries. Of these individuals in Chicopee, approximately four hundred (including Plaintiff) were salaried, non-union employees.

6. At that time, the number of salaried, non-union employees included exempt supervisors and managers that worked in the factory directly overseeing the union factory employees involved in the manufacture of golf balls. A far larger number of those performed executive, managerial and administrative functions relating to the marketing, sale and distribution of golf balls and other golf-related products, as well as sporting goods, and a variety of other golf and sports related business operations that were managed from Spalding's corporate headquarters in Chicopee, including sales and marketing, finance, risk management, R&D, HR, IT and legal.

7. In addition to manufacturing golf balls at its Chicopee facility, Spalding operated a golf ball manufacturing facility in Gloversville, New York. There were a small number of on-site managers in Gloversville who reported to executives in Chicopee. Office employees working in Chicopee were responsible for purchasing materials for the manufacturing process in Gloversville, for accounting and financial functions relating to the balls produced in Gloversville, and even most of its human resource functions. Virtually all office support functions for the Gloversville facility were, at the time, performed in Chicopee.

Spalding also operated a golf club assembly facility in Gloversville, assembling SPALDING and TOP-FLITE branded clubs, but which closed a few years ago. Like the golf ball facility (which is still in operation today), office employees in Chicopee supported the golf club assembly operation.

8. In 1997, Spalding purchased the assets of the Ben Hogan Company, which was known for its line of BEN HOGAN brand golf clubs and accessories. One year earlier, in 1996, Spalding had purchased the assets of Etonic, Inc., which was known for its ETONIC brand of golf shoes and golf gloves, as well as athletic shoes.

9. Spalding operated a facility in Ft. Worth, Texas that assembled BEN HOGAN brand golf clubs. Like the Gloversville operations, those overseeing the Ben Hogan facility reported to managers in Chicopee. Office employees working in Chicopee were responsible for procuring materials for

2

the assembly process being performed in Texas, for scheduling the assembly work to be done in Texas, and for accounting and financial functions relating to the assembly of BEN HOGAN brand golf clubs in Ft. Worth. Office employees working in Chicopee were likewise responsible for all marketing and sales of BEN HOGAN golf clubs.

10. Spalding also acquired the Brockton, Massachusetts headquarters of Etonic when it bought that business in 1996. Shortly after that acquisition, Spalding closed the facility and the Etonic business was managed from Spalding's corporate headquarters. Spalding also operated a facility in Richmond, Maine that produced ETONIC golf shoes. Like the Gloversville and Ft. Worth operations, those overseeing the Richmond facility reported to managers in Chicopee. Office employees working in Chicopee were responsible for procuring materials for and scheduling production at Richmond, and for accounting and financial functions relating to that facility. While the Richmond facility was closed and all ETONIC golf shoe production moved to the far east in 1999, office employees working in Chicopee continued to procure ETONIC golf shoes for Spalding, were responsible for scheduling production of the shoes, for all accounting and financial functions, as well as all marketing and sales of ETONIC golf shoes.

11. In addition, while with very limited exceptions Spalding had ceased manufacturing anything other than golf balls in Chicopee, it had continued to have a sporting goods division which, *inter alia*, procured and sold the SPALDING line of basketballs, footballs, soccer balls and volleyballs. Using licensing agreements, Spalding would license unrelated third parties to produce and sell a variety of apparel and other sporting goods with the SPALDING logo. All support functions for the domestic sporting goods business (sometimes referred to as "inflatables") and the licensing business were performed by office personnel in Chicopee.

12. Spalding employees in Chicopee also managed an international department, which included wholly-owned subsidiaries in Canada (Spalding Canada), the United Kingdom (Spalding Sports UK), Sweden (Spalding Nordic), Italy (Spalding Europe), Japan (Spalding KK), Australia (Spalding Australia) and New Zealand (Spalding New Zealand). The heads of these foreign subsidiaries reported to managers in Chicopee, who were responsible for overseeing the accounting and financial operations of the subsidiaries. For those areas of the world not served by its foreign subsidiaries, Spalding had agreements with scores of distributors in smaller markets including Mexico, South America, South Africa, the Mideast, Russia, China, the Pacific Rim and elsewhere. Managers in Chicopee oversaw the operations of these distributors as well.

13. Spalding also maintained a branch office in Taiwan; employees there coordinated production of inflatable products at Spalding's far east

3

manufacturers. The Taiwan office reported to managers in Chicopee as well.

14. Spalding also operated a small outlet store selling its brand items at a facility attached to its Chicopee, Massachusetts facility.

15. Spalding's golf and sporting goods businesses had been owned by various corporate entities prior to SHC's being acquired by Kohlberg Kravis Roberts & Co. (commonly referred to as "KKR") in 1996, a New York City-based private equity firm that focuses primarily on late stage leveraged buyouts.

16. In December of 1998, Spalding's majority owner, KKR, recruited James Craigie to be Spalding's new president and chief executive officer ("CEO"). KKR had purchased Spalding (through its purchase of SHC) in 1996, but the company had continued to lose money. KKR expected Craigie to lead a new team to turn the company around.

17. Craigie had been an executive with Kraft Foods. In 1999, Daniel Frey was recruited from Duracell to become Spalding's chief financial officer ("CFO").

18. Craigie, as part of his new team, also hired Michael Esch from Kraft to be the Executive Vice President of Operations overseeing the manufacturing process, Louis Tursi, who had worked for Kraft before moving on to Vlassic Foods, to serve as the Executive Vice President of Sales and Marketing, and Edward Several, also from Kraft, to serve as Vice President of Marketing Services.

19. Craigie, Esch, Tursi and Several had no golf business related history, having worked in the food industry. Some incumbent employees at Spalding derogatorily referred to the food industry executives as "cheeseheads", to denigrate their lack of golf related experience.

20. As President and CEO, Craigie presided over Spalding's operating committee (referred to as the "OCM") or the senior management team. The OCM was comprised of the most senior officers of the company, including Frey, Vaughn Rist (the Vice President of Human Resources) and me. At its largest, the OCM had 12 members. In addition to Craigie, Rist, Frey and me, OCM members included Tursi, Several, Esch, Thomas Kennedy (Vice President of Research and Development), Christine Rousseau (Vice President and Chief Information Officer), Keith Keindel (head of the International division), Eddie Binder (head of marketing), and Stephanie Lawrence (head of licensing). Binder and Lawrence had left before the events in question here, and had not been replaced on the OCM.

21. Although Craigie and the OCM were ultimately accountable to the board of directors - which was controlled by Spalding's majority owner, KKR - the

4

OCM, under Craigie's leadership, made the critical management decisions that directed the future of the company.

22. In 1999 and 2000, Spalding faced significant competitive challenges when Nike, TaylorMade-adidas, and Callaway entered the golf ball market. These challenges were compounded by the economic downturn following the events of September 11, 2001, increased competition from Titleist (a golf brand owned by Acushnet Company, then Spalding's largest competitor in the golf ball business), and the fact that golf, as a sport, was in a nationwide decline.

23. In addition to its operating losses, there was a large debt service relating to KKR's earlier purchase of SHC. KKR's purchase, costing nearly a billion dollars, had resulted in combined senior and subordinated debt of nearly $850,000,000. At OCM meetings it was articulated that the debt service was the principal impediment to Spalding's ability to achieve financial success.

24. In the Fall of 2001, Craigie recommended to the board of directors that Spalding be sold or, if a seller could not be located, that it undergo significant changes aimed at cutting costs so that it could survive as a stand-alone entity. In order to increase the company's desirability to potential buyers, the OCM discussed a variety of cost-cutting measures, including a possible one-third reduction of employees.

25. In the Spring of 2002, SHC entered into a restructuring agreement with Oaktree Capital Management, which had acquired majority positions in SHC's senior and subordinated debt. Oaktree forced KKR to relinquish its majority ownership of SHC, and after the restructuring was SHC's majority owner. The restructuring provided Spalding with additional time to try to forestall bankruptcy as its losses continued to mount.

26. In May, 2003, continuing to suffer millions of dollars of losses annually, Spalding sold its sporting goods division, including the SPALDING line of basketballs, footballs, soccer balls and volleyballs, and the DUDLEY line of softballs, to Russell Corp. Included with the sale was its historic SPALDING brand name.

27. In a separate transaction in the same timeframe, the company sold its ETONIC golf shoe and glove business.

28. As a result of these sales, the only portions of the business remaining by June of 2003 were those related to golf ball manufacturing and sales, its TOP-FLITE golf club business (which involved the procurement of finished sets of clubs from China), and the BEN HOGAN golf club assembly business based in Texas.

29. Furthermore, having sold the SPALDING name, the business in Chicopee that formerly had been known as Spalding had to rename itself. It chose to rename itself after the golf ball it manufactured, and became The Top-Flite Golf Company.

30. Some office employees, working in an environment where the potential closing of the business appeared to be possible, if not likely, obtained alternative employment and were not replaced. However, to a significant degree, the size of the office workforce remained unchanged notwithstanding the mounting losses and the divestiture of major business operations. The OCM, in its discussions, recognized that with the sale of a significant portion of its business lines, its employee complement of salaried office employees was disproportionately high compared to its actual needs, and contemplated adjusting the employee complement at the time. However, the discussions at the OCM meetings reflected a realization that the remaining portion of the business would likely soon either be sold or the company would have to file for bankruptcy. Accordingly, even after the sale of much of its operations in the spring of 2003, the OCM ultimately decided to take no action to adjust its salaried workforce downward to reflect the adjusted needs of a business that now solely involved the manufacture and sale of TOP-FLITE and BEN HOGAN golf balls, the procurement of TOP-FLITE golf clubs, and the assembly and sale of BEN HOGAN golf clubs.

31. Not long after selling off its sporting goods business, the SPALDING name, its Etonic and Dudley businesses, on June 30, 2003, the former Top-Flite/Spalding entity filed a Voluntary Petition for Bankruptcy in the United States Bankruptcy Court for the District of Delaware, Case No. 03-12004-MFW.

32. The bankruptcy court ordered that what remained of the Top-Flite/Spalding assets be auctioned through the bankruptcy proceedings.

33. Callaway Golf Company (hereinafter "Callaway") is a public corporation based in Carlsbad, California, where it maintains manufacturing facilities, its headquarters, and its executive and office staff. By 2003, Callaway had, for several years, been the number 1 rated golf club company for woods, irons, and putters.

34. TaylorMade-adidas Golf ("TMaG") a competitor, sells TAYLORMADE equipment, adidas apparel and footwear, MAXFLI golf balls, and ROSSA putters.

35. From the outset of the bankruptcy it appeared that Callaway and TMaG would be the most likely bidders.

36. The question of a significant reduction of force was raised again at an OCM meeting shortly after the bankruptcy filing. The members of the OCM discussed a substantial downsizing; and even identified certain individuals that the Company might be able to do without, including specifically Paul Duval, and many other individuals later terminated by TFGC. In fact, I recall Duval's name being raised on several previous occasions as someone who might be laid off in previous reductions in force, well before his eventual layoff. However, he was competent and popular, and someone always found a reason not to eliminate his position; or if it was eliminated, he would be moved to a different position.

37. The OCM once again decided not to take any action because it was, by then, clear that there would be an auction and the company's remaining assets were likely to be acquired by either Callaway or TMaG. Based on preliminary conversations, it was believed that an acquisition by Callaway would result in the creation of a stand-alone operation. On the other hand, it was believed, based on visits to the Chicopee facility by representatives of far east companies, that if TMaG were the successful bidder, its plan was to shut down the factory, move the manufacturing equipment to the far east, and manage the former business from its own California headquarters. As a result, the OCM decided to defer any reductions in force, concluding that if TMaG was the successful bidder at the auction, the issue would be moot as everyone would be laid off, and that if Callaway was the successful bidder at the auction, it would want to make its own decisions as to who to retain and who to let go.

38. When TFGC came into existence in mid-September 2003, the company employed 367 office employees, all former Top-Flite/Spalding employees, in its Chicopee executive suites and offices.

39. Frey was not among them, as he voluntarily left and accepted a position with St. Paul Traveler's on or about June 20, 2003. In addition, since Callaway wished to bring in one of its own employees to manage TFGC's business, Craigie's employment was then terminated.

40. In September 2003, some of the assets of the bankrupt Top-Flite/Spalding entity were purchased, through the court ordered bankruptcy auction, by an entity then called TFGC Acquisition Corp., a newly formed, wholly owned subsidiary of Callaway, separate and distinct from the former Top-Flite/Spalding entity that had filed for bankruptcy. Desirous of retaining the marketing advantages of the TOP-FLITE brand, the new company changed its name and designated itself "The Top-Flite Golf Company, a wholly owned subsidiary of Callaway Golf Company". The former Top-Flite/Spalding entity also changed its name and became TFGC Estate Inc. which remained in existence for a period of time to close the affairs of the bankrupt business, including, to the extent feasible, paying off the pre-

bankruptcy debts of the Top-Flite/Spalding entity and the liabilities incurred while it had operated in bankruptcy for 2½ months, liabilities not assumed by Callaway as part of its auction bid.

41. On or about September 15, 2003, office employees of the former company, including Plaintiff, received a letter offering "*new employment*" with the newly created Company. If they accepted, the new employees were required to complete new "Employee Invention and Confidentiality Agreements", they were required to sign documentation indicating that they were aware of the new company's Sexual Harassment Policy, and to sign a new Callaway Golf Information Security Policy and Agreement.

42. TFGC did not accept the existing collective bargaining agreement in place between former Top-Flite/Spalding and the union representing the factory employees, but rather, negotiated a new collective bargaining agreement which differed in material ways, including the fact that it did not continue the prior company's pension plan, retiree medical insurance and other benefits.

43. Several major entrepreneurial changes affecting both Callaway and TFGC, including its Ben Hogan operations, have occurred since September 2003, as the companies attempted to stem a continuing tide of financial losses. These changes included a decision by Callaway, in the winter of 2003, to close the Ben Hogan Ft. Worth, Texas operation, and consolidate all its golf club manufacturing and assembly operations in Carlsbad, under the direction and supervision of Carlsbad-based Callaway employees. As a result, in the spring of 2004, the Texas facility was closed and all BEN HOGAN golf club assembly work was moved to Carlsbad, California. Procurement for TOP-FLITE golf clubs had already been transitioned to Carlsbad.

44. In approximately the same time-frame, there was a decision made by Callaway to close its own golf ball manufacturing operations in California and transfer the manufacturing of CALLAWAY golf balls, a "higher end" ball than the TOP-FLITE brand, from California to Chicopee, Massachusetts. This decision enhanced factory employment in Chicopee.

45. Other entrepreneurial changes were more gradual, the result of abandonment of the original plan to have TFGC operate as a stand-alone company, with Robert Penicka as its Chicopee-based president. At the time TFGC was created, Ronald Drapeau, then Callaway's CEO, asked Penicka to relocate with his family from California to Chicopee to become the President of TFGC. Penicka was 41 years of age in September of 2003. He is no longer with Callaway or TFGC.

46. Even though TFGC remains a separate legal entity, it has ultimately become a mere division of Callaway rather than, as Drapeau had originally

said he intended, a distinct stand-alone business, before he himself had been removed as Callaway's CEO.

47. By June 2005, the decision was made by Callaway to merge the TFGC sales and marketing operations, as well as its accounting and financial operations. The sales personnel would report to individuals in Carlsbad, and would sell Callaway products as well as TFGC products as employees of Callaway. Finance functions previously performed in Chicopee would likewise be moved to Carlsbad. Chicopee became simply a manufacturing facility, with virtually all managerial and administrative functions being performed by personnel working for Callaway in Carlsbad.

48. The Research and Development function (R&D) remained in Chicopee after the departure of sales and finance functions, but presently those functions are also being transferred to Carlsbad, and R&D engineers and scientists in Chicopee are being laid off. In many ways Chicopee has become to Callaway what the Gloversville facility had always been to Spalding: solely a manufacturing facility with a few supervisors and lower level support staff, but with virtually all managerial and administrative functions controlled by personnel working at the corporate headquarters, which is now Carlsbad rather than Chicopee.

49. Penicka decided, in the spring of 2004, to terminate Tursi, the Executive Vice President of Sales and Marketing, and a member of the OCM. At the same time Penicka terminated two of Tursi's direct reports, Edward Several (age 43), Vice President of Marketing Services & Customer Service, and Timothy Seitter, Vice President of Marketing (age 38). At the time, sales were falling and the combined salaries of the three vice-presidents brought in by Craigie and/or Tursi to oversee sales and marketing exceeded ¾ of a million dollars.

50. Penicka spoke at a meeting of the Chicopee Chamber of Commerce in June 2004. At that time, of the six members of the senior management or OCM staff he had inherited when he assumed the presidency, Penicka had removed only the two youngest, Tursi, age 42 and Esch, age 47. He had replaced these individuals, who had been recruited by Craigie after his own arrival in December of 1998, with two colleagues of his who had worked with him at Callaway, *i.e.*, Thomas Fry and James ("Jamie") Bosworth. He had also filled the vacant CFO position, previously held by Dan Frey, by hiring Andrew Kelleher. Kelleher, Fry and Bosworth were the new members of the OCM team.

51. On the other hand, Penicka had retained on the OCM staff all the OCM members who predated Craigie's arrival at Spalding. Those retained by Penicka, and remaining as part of the OCM team, included Vaughn Rist, Vice-President of Human Resources, age 62; Tom Kennedy, age 48, Vice-

President of Research and Development; and Christine Rousseau, age 52, Vice-President of Information Technologies and myself, age 50, Vice President and General Counsel.

52. Plaintiff was one of hundreds of office employees initially hired by TFGC who have lost their position. In total, between its creation in September 2003, and May 2006 when it answered interrogatories in this matter, a total of seven hundred eighty-five (785) TFGC employees were laid off, terminated or resigned. (Resignations were included in the Answers to Interrogatories because separations were coded as a resignation even when employees had been given notice that they would be laid off, and thereafter resigned (presumably as a result of finding alternative employment) before they were actually laid off.) Furthermore, we know that others presumably resigned because they recognized that they were likely to be laid off and were actively searching for alternative positions.

53. Refining it to office employees, at the time the new company was created in September 2003, there were 367 office employees of TFGC in Chicopee. There are now fewer than 100 exempt salaried employees working for TFGC in Chicopee, substantially all involved in direct manufacturing or research and development.

54. The R&D function, like sales, finance and other functions earlier, is presently being transferred to Carlsbad. Most of the R&D engineers and scientists who were exempt salaried employees, have either been laid off or notified that they will be laid off by December 31, 2006, with a few more being informed that they will be laid off in April 2007, as the number of salaried exempt employees in Chicopee continues to shrink.

55. Of the eight OCM members at the time of the Chamber meeting in June 2004, at the present time the only one continuing to work full-time in Chicopee is Fry. Kennedy, while still a full-time employee, works off-site as an inventor, since he no longer has any employees to manage.

56. Rist retired and was not replaced. When the sales function was transferred to California in June 2005, Bosworth was terminated and not replaced. Kelleher resigned and was not replaced, after the financial functions were transferred to California. Rousseau moved to California to work for Callaway and was not replaced. I became a part-time employee, overseeing existing litigation and working on Callaway matters for the Carlsbad legal department two or three days a week, and working in private practice the remaining time.

57. The changes in employment in Chicopee and elsewhere occurred at various times, and for somewhat different reasons, although most were layoffs precipitated not from poor performance by the individual, but rather from

10

business decisions in an effort to return to profitability. The first such decision was in mid-December 2003, when a limited number of positions performing functions that were redundant to those being performed by corporate officials in Carlsbad, duties such as the Director of Risk Management (Dennis Paren) and the Director of Taxation (Michael Lyon) were eliminated.

58. The decision, also made during the winter of 2003, to close the Ft. Worth, Texas Ben Hogan operations resulted in the closing of the Ft. Worth facility and 22 office and factory employees being laid off from their positions, between April and the end of May 2004, when the facility was entirely closed.

59. That same decision, however, while causing the layoff of some in California, has been a "life-raft", if not a boom, for factory employees working for the company in Chicopee. Thus, while there has been a dramatic decrease in the number of office employees working in Chicopee, by virtue of the integration, and specifically the decision to move the manufacture of CALLAWAY brand golf balls to Chicopee from California, there has been a commensurate *increase* in the number of factory employees working in Chicopee. The number of factory employees in Chicopee has increased from 531 when the new company started to 573 as of April 2006. The number of direct supervisors for the factory employees (included as part of the salaried office group) has also risen in this period, or the numbers of current "office employees", whose numbers include these factory floor managers, would be even less than it is.

60. From the time TFGC was created in September 2003, through the end of that calendar year, the new company lost nearly nine million ($9,000,000) dollars, suffering a net loss of $8,818,000 in less than four months.

61. In March 2004, the OCM held an off-site retreat at the Hilton Garden Inn in Springfield to discuss the situation that the company was facing – *i.e.,* the negative profitability of the company. The meeting lasted all day and the senior managers discussed the need for layoffs and the strategy for the business. Kelleher gave a bleak presentation on the financial situation of the company, indicating that it was in financial trouble. Its operating expenses significantly exceeded its operating income or revenue. The discussion revolved around how the company could try to correct the situation either by increasing sales or reducing costs or some combination thereof. No decision was reached as to whether or not to have layoffs. It was decided that each manager needed to evaluate his or her own organization to determine whether or not it had the correct head count to support our organization. Penicka gave each OCM manager the task of making such an assessment for his own department.

62. The issue was addressed at a follow-up staff meeting held a week or two later in Chicopee. Kelleher discussed how the financial situation would not get any better based upon trying to increase revenues and stated that the Company had a bloated organization, inherited from Spalding, from the vantage point of head count and spending. It was decided that the senior staff needed to come back with concrete recommendations for a reduction in force as well as reduction in expenses. There was a decision made to have a layoff at that time, but no discussion targeting how many people, or how much money would need to be saved by a layoff, or as to what other expenses to cut.

63. There were steps to cut discretionary spending. These included reducing marketing expenditures associated with print media; marketing expenditures associated with free goods as well as efforts to reduce insurance-related costs. It was also decided that the retail store would be closed.

64. On or about April 15, 2004, 41 Chicopee office employees (as well as seven field sales personnel) received letters indicating that they would be laid off. The letters noting the company's ongoing financial losses, indicated:

    > It is necessary to match current levels of overhead with projected revenues. Unfortunately, a downsizing of the Top-Flite workforce is being implemented. This action will impact many employees, at all levels, and as a result your employment has been terminated from the company effective today, with your salary continued through April 30, 2004.

65. In consideration of the salary continuation and severance offered to the laid-off employees, the letters also included releases of claims against the company, and gave the employees twenty-one days in which to consider them. All employees were provided the full amount of time, if not more, to consider whether to agree to the severance package. All employees agreeing to the offer and signing the release agreement received the severance payments outlined in their individualized severance package. No employee has ever tendered back any severance payment prior to commencing legal action against TFGC.

66. Employees laid off in April of 2004 were not provided with demographic information indicating which employees had or had not been laid off and offered severance payments in exchange for a release of claims. The company later did commence that practice after being sued by several individuals who had received significant severance payments, signed a release, and thereafter commenced a lawsuit.

67. In late May of 2004, in response to communication from an attorney of an employee laid off in April, I requested that an analysis be prepared to show

the age impact of the April 30, 2004 layoffs. A report was prepared by Mary Gay, who was not advised as to the purpose of the report. The data prepared showed that the average age of the Chicopee salaried workforce before April 15, 2004 was 44.3. After the layoff the average age was 44.4. The average age of the Field Sales Offices prior to the April 15, 2004 terminations was 41.2, the average age after was 40.9.

68. While the overall numbers of office employees has been dramatically reduced, the demographic profile of the office employees was not altered significantly between September 2003, when TFGC was formed, and May 2006 when it responded to Interrogatories. The data prepared to respond to Plaintiff's interrogatories show that at the time TFGC was formed, 29.7% of office employees were over the age of forty. The percentage of office employees over forty has *increased*, and by May 2006, 31.6% of the office employees were over the age of forty.

69. As of April 2006 there remained only 110 exempt salaried office employees employed by TFGC. Of the 110, thirty-five (35) were over forty years of age.

70. The Company has continued to reduce the number of exempt office employees, particularly in the G&A and Sales classifications, which included Plaintiff's classification. Thus, since its inception, the Company has assigned a classification to each exempt salaried employee. These classifications included Sales, Manufacturing, G&A (general and accounting), marketing, customer service, etc. At the present time the total number of salaried exempt employees in Chicopee is down to ninety-one (91). Not only is the total number of exempt salaried office employees a fraction of what it was in September 2003, many classifications within that category have been entirely eliminated or nearly eliminated. When TFGC was formed in September 2003 there were eighty-six exempt salaried employees in the "sales" classification category, including eleven working out of Chicopee. There are now, in November 2006, none. There were eight (8) salaried exempt employees classified as International, including Paul Duval. There are now none. There were twenty-six (26) in the classification of R&D (research and development). There are now six (6) and all but one will be eliminated by April 30, 2007. The one remaining will be Kennedy, whose role has already changed from a department manager to an inventor reporting to the Senior Vice President of R&D in Carlsbad. There were 60 in the G&A Category, which includes accounting functions, human resources, legal support, the company store, etc. There are now a total of only 19. On the other hand, there were sixty-two (62) salaried exempt employees in the classification of manufacturing in September 2003 (including factory supervisors, engineers, etc.) Consistent with the increased manufacturing operations there are now sixty-six (66).

13

71. At no time did I ever hear any manager of TFGC indicate that age should, or did, play any role in any decision that was made relating to any reduction in force.

I have read the above and swear that it is true.

_____
Peter A. Arturi

On this 29th day of November, 2006, before me, the undersigned notary public, personally appeared Peter A. Arturi, known to me or proved to me through satisfactory evidence of identification to be the person whose name is signed on the preceding or attached document in my presence.

_____

**ROBIN A. KAHN**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JUNE 30, 2010