UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAUL DUVAL,                          )
            Plaintiff                )
                                     )
vs.                                  )        CIVIL ACTION NO.: 05-30181-MAP
                                     )
THE TOP-FLITE GOLF COMPANY,          )
            Defendant                )

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### STATEMENT OF FACTS

In September of 2003, Callaway Golf Company purchased certain assets of the former

Spalding Sports Worldwide. (Exh. 1) In doing so, Callaway formed the Top Flite Golf

Company, meant to be a stand alone entity that would manufacture and sell golf balls and golf

equipment under the Top Flite and Ben Hogan names, as had Spalding. (Exh. 1) Prior to this,

Spalding had been in bankruptcy, (Exh. 1) largely related to the failure of its management after it

had been purchased in 1996 by KKR. (Exh. 1) In additional to a different sales and marketing

approach, KKR had saddled Spalding/Top Flite with a debt of over $850,000,000. (Exh. 1). This

meant that even when the company was operationally profitable, it continued to lose money (Exh.

1) Prior to this, Spalding/Top Flite had been averaging $55-$60 million dollars a year in profit.

(Exh. 1)

Callaway took over a new company which had already separated itself from Spalding

products and which had already had layoffs and numerous transfers of employees who had

worked on Spalding goods. (Exh. 1)

When Callaway took over, Robert Penicka, who is in his early forties, had become the

President and CEO of the Top Flite Golf Company. (Exh. 2, pp. 7-10) The intention was to

operate Top Flite Golf Company as a stand alone entity. (Exh. 1) Penicka hired and put in place

a new management team which included Andrew Kelleher, Jamie Bosworth and Thomas Fry, all

in their thirties. (Exh. 2)

Defendant's essentially assume that there is only one statement or piece of evidence

reflecting age bias on the part of the new Callaway management team, that being Mr. Penicka's

statement at the Chicopee Chamber of Commerce. This is not true. The evidence will show that

Callaway brought with it a deep and abiding age prejudice that was reflected in numerous

comments and actions of the new management team. This attitude of age bias came from the top

(Mr. Penicka), and affected every decision maker in this case: Mr. Bosworth, Mr. Kelliher, Mr.

Fry and Mr. Levandowski.

The nature of Mr. Penicka's statements at the Chicopee Chamber of Commerce are not

substantially disputed.[1]

What Mr. Penicka stated in his speech was:

"...if you all look up at the head table, you'll notice a lot of young faces up here and
that's not by accident, that's by design, and in some cases, the people that are in the
jobs they're in may not even be qualified to be in them yet". (Exh. 3, p. 192)

---

[1] Defendant attempts to mitigate the effect of what even Mr. Penicka admits to, as
somehow a reaction to questions or comments initiated by outsiders who were at the Chamber
meeting. This assertion is of course irrelevant in the summary judgment context, but it's highly
improbable nature is notable. It is unlikely that other members of the Chamber would suddenly
decide to initiate questions to the new president suggesting he was engaging in age discrimina-
tion when he came to a public function to introduce himself to the community. It is notable too
that Mr. Duval's version of the statement, is generally supported by other former employees who
are not litigants or interested parties, whereas Mr. Penicka's version is only supported (if at all) by
decision makers in this case who are implicated in the discriminatory practices.

-2-

Mr. Penickas' attitude permeated the Company. In the spring of 2004, he hired Jamie Bosworth to be the National Sales Director. Mr. Bosworth quickly held a meeting with his regional sales force. He began the meeting by asking the regional managers how many sales people they would get rid of. Bosworth stated that the people who had been there over 20 years were "bleeding the company dry". (Exh. 5) He referred to the "old regime" in speaking of existing employees and called them "deadwood". (Exh. 5)

In response to Mr. Bosworths' request, one of the regional managers complained that he had a number of older sales people and that if he had to let them go, there would be issues of age discrimination. (Exh. 5) Mr. Bosworth cynically suggested that he could escape this problem by also laying off some young people to make it look good ("just fire a couple of young guys with the old guys and no one will notice"). (Exh. 5)

At that meeting, one regional manager, a new hire (by Mr. Bosworth), Mr. Conley (age 34), said he could let go 9-11 of his sales force of 15. (Exh. 5, Exh. 4, p. 51)[2] Mr. Conley had not yet even met these men (Exh. 5). David Richardson said that he could only let go one individual (who happened to be in his late twenties). (Exh. 5) Four weeks later, Mr. Richarsdon was terminated (Exh. 5). Mr. Bosworth testified that it was Dave Richardson who had asked the question at the regional meeting about age discrimination (Exh. 4, p. 33) Bosworth said he terminated Mr. Richardson because he had a "bad attitude". (Exh. 4, p. 48). During that time, period, Mr. Richardson and Richard Gielow were the top performing regional managers that the Company had. (Exh. 5, 6) Mr. Bosworth terminated both of them. In Mr. Richardson's case, he was told that his job was being eliminated to make way for the hiring of Reid Gorman, age 34, a

---

[2] Mr. Bosworth also hired: Mr. Gorman, age 31, Mr. Reh, age 35, Mr. Arnold, age 33, Mr. Blake, age 30 and Mr. Martin, age 40. (Exh. 4, pp. 51, 123-124, 173)

friend of Mr. Bosworth's (Exh. 5).

In Mr. Gielow's case, Mr. Bosworth said Mr. Gielow was let go because he was "incompetent" (Exh. 4, p. 48)  But Mr. Gielow was told that his position was being "consolidated" (Exh. 6).  In fact, he was immediately replaced by an individual named Chris Reh (age 35), who had no management experience, and who now *works for* Mr. Gielow (Exh. 6)

The evidence of Mr. Bosworth's attitude towards age is not limited to these events that occurred while he was at Top Flite.  When he appeared at his deposition in this case, even though he obviously knew that he was appearing as a management representative and decision maker in an age discrimination law suit, he could not restrain himself from discriminatory comments.  He referred to the "inside crew" at Top Flite as the "old regime".  (Exh. 4, p. 119).  He explained at length that Paul Duval was part of the "old regime", that he "concentrated on how things were done in the past", he criticized Mr. Duval "because Paul was telling us what we should do from ten years ago and it had no point of relevance", and he was "just so stuck in the old ways" (Exh. 4, pp. 28-33).  In fact, Mr. Duval never expressed these attitudes, it was *Mr. Bosworth's* perception that he was stuck in "old ways" (Exh. 1).

At his deposition, Mr. Bosworth also offered his opinion about "experience":

> I made the statement a lot is that a lot of people there who said they had twelve, thirteen, fifteen years experience and, in my opinion, they had one year of experience, they just did it thirteen times or fifteen times in a row (Exh. 4, pp. 26-27)

Mr. Bosworth made it clear that the above remarks were directed at "most of the sales management team" and in particular, Paul Duval (Exh. 4, p. 27).  He reiterated that Mr. Duval didn't really have more experience in the golf business than the 34 year old Reid Gorman because he just "had more years on the job', but not more "experience" because he was not "exposed to

the types of business that the modern golf equipment manufacturers needed". (Exh. 4, p. 111) Mr. Bosworth also identified Lou Turisi (age 47), his predecessor, as a member of the old regime (Exh. 4, p. 28) and on a visit to Top Flite before his hiring, told Bob Penicka he had no interest in working with "that gentleman", who Mr. Bosworth laughed at to his face, telling him "on a social visit" that he was "still in the past". (Exh. 4, pp. 140-141)

Andrew Kelleher, who made the decision to terminate John Bettencourt and Michael Behaylo demonstrated the same attitude as Mr. Bosworth and Mr. Penicka. Mr. Kelleher who was in his thirties and who held the position of Vice President of Finance, told John Bettencourt that long term employees who "are still here all this time" were "deadwood". (Exh. 7, #12) and that the top management of the Company looked at people with a lot of seniority and could not understand why they were still there. (Exh. 8, pp. 107-108)

Just like Mr. Bosworth, Andrew Kelleher could not restrain his discriminatory attitudes at his deposition. He too, knowing he was appearing as a management representative in an age discrimination suit, still maintained his prejudiced beliefs. When shown a department organization chart (Exh. 9), he referred to it as the organization he had "inherited" and stated "it is a lot of legacy folks that had been around with Spalding" (Exh.10, pp. 10-11). Mr. Kelleher considered both Mr. Bettencourt and Mr. Behaylo "overqualified" for accounting positions and a few months after their layoffs, he hired recent college students in their 20's as accountants. (Exh. 10, pp. 53-54) Mr. Kelleher told Paul Duval that anything that had happened before 2003 was "meaningless". (Exh. 3, p. 212)

The Callaway vision of the desirability of a "young by design" team was also shared by Richard Levandowski, who played a role in the termination of Michael Behaylo and by Thomas Fry who made the decision to terminate Gary Lonczak. Mr. Levandowski was Mr. Bettencourt's

-5-

successor in the finance department. (Exh. 11, p. 10). When asked about discussions he'd had

with Mr. Kelleher, Mr. Levandowski had the following thoughts to offer:

Q.   Did you ever hear him comment on the age of the
     employees who were there when he arrived or throughout
     your tenure?

A.   We always talked about the age of the manufacturing group
     because that seemed to be always one of our problems.
     Is's an elderly workforce and therefore generates additional
     costs in higher medical insurance, higher costs of those
     things.

Q.   Higher cost of what?

A.   Medical costs and that type of cost.

Q.   Again, when you say the manufacturing group, that would
     include who?

A.   Basically the hourly people.

Q.   These are people involved directly in the manufacture of the balls?

A.   Right.

Q.   When you say "we" would discuss it, you mean who?

A.   Well I would discuss it with Andrew. We would look at
     the costs. We'd have a lot of absenteeism. If it gets really hot, some of the
     elder people do not show up as often; it's just the way it is.
     It wasn't a statement of degrading anybody, it's just, okay, we have an
     elderly workforce, we're going to have higher medical benefits, we're
     going to have higher absenteeism. It just happens.

Q.   Had someone examined the absenteeism in relationship to the age of the
     workers?

A.   I believe we had that study done just to get -- over a brief period of time,
     eight, ten weeks.

Q.   When was that done?

A.   I couldn't be honest and tell you. I mean, we would look at it at least once
     a year just to see what was going on. Absenteeism was always a big
     problem.

Q.   When you say "we," now you're talking about who?

A.   If it was absenteeism, we would ask Lynn because at the time she also had
     payroll so we'd let her do the research and give us with statistics.

Q.   What was the research you were asking her to do?

A.   We'd look and say –

Q.   When you say "we" you mean who?

A.   Management - - Andrew, myself, Jim Laughlan, we would look at the
     manufacturing costs, we'd get Tom Fry involved.
     We'd say this is a problem, get into the summer months or the high peak
     periods of production and if you have high absenteeism then you have to
     work overtime to recover the same amount of hours. It's just additional

expense.

Q.   You're saying that in particular you had asked Lynn Lafond to do a study on that?

A.   We would ask to take a look at the absenteeism, is it running higher than normal, is it the same.

Q.   Did she produce such reports?

A.   Yes.

Q.   Did you ask that it be analyzed in terms of the age of the employees?

A.   Well, we kind of knew which departments were more elder than not. We knew where the younger people had been just hired or the younger ones were. We didn't do it by age specific.

Q.   How did you conclude that the older workers were more prone to absenteeism?

A.   I didn't say the more elder. I said we have an elder workforce so that tends to lead to higher than normal absenteeism. If you take a look at a younger workforce - - and it doesn't matter it it's in this business or not - - you go to a younger workforce they have a tendency to not have as much absenteeism.

(Exh. 11, pp. 43-44 )

These comments are revealing in many ways. While defendants may attempt to dismiss them as comments about hourly workers, they clearly reflect, and are consistent with the Company's attitude towards all older workers as demonstrated in other statements by Messers. Penicka, Bosworth and Kelleher. It is notable as well that Mr. Levandowski states that Tom Fry was part of this group which monitored and worried about employee's ages. Mr. Fry was the decision maker in Mr. Lonczak's case.

Lastly, the depth to which the Callaway's attitude towards age and experience permeated the Company was also evident when a member of Callaway's personnel department in California visited Chicopee to help employees with the new benefit package. She commented that she had never seen a company with so many employees with over 20 years seniority and that, at Callaway, she was accustomed to people who had been there less than 10 years. (Exh.1)

-7-

**Paul Duval**

Paul Duval is 56 years of age. He began working for Spalding as a "calender worker/sweeper - mill room" in 1969. (Exp. 3, pp. 9-12) He was terminated in July 2004. In the interim, his thirty five years of service spanned almost the entire scope of the Company. Up to 2004, he served as a production manager, planner, master scheduler, manager of production control, materials and procurement manager for golf, marketing and assistant production manager for golf clubs, director of the custom ball division (sales), member of the SAP project team, manager of sales planning and director of marketing for International. (Exh. 3, pp. 82-104) He had served, therefore, in production, planning, procurement, sales, marketing and international, and there is no dispute that his performance was excellent. In January, 2004, he had an opportunity to leave Top Flite, but stayed on despite the many changes occurring in the Company. (Exh. 3, pp. 21-22) Although the Defendant paints a picture of Mr. Duval as a perennial candidate for layoff, Mr. Duval, in addition to increases in salary, was given a retention bonus in July of 2003 of $12,000 - $15,000 to ensure that he would remain with the Company. (Exh. 3, pp.113-114) In 2003, Mr. Duval served as manager of sales planning, but that position was eliminated in May, and he was asked to be Director of Marketing for International. After Callaway took over Top Flite in September, 2003, it decided to eliminate many International positions and Mr. Duval's position was eliminated. (Exh. 3, pp. 150-155) Mr. Duval however was told by Personnel Director, Vaughn Rist, to "hang in there", he would have something for him. (Exh. 3, p. 155) Mr. Rist arranged to have Mr. Duval interview with Jamie Bosworth who had just been put in charge of sales. (Exh.3, p. 167) Mr. Bosworth hired Mr. Duval on May 17, 2004, to be director of sales planning, a role that Mr. Duval had previously served in a prior sales department. (Exh. 3, pp. 167-179)

Mr. Bosworth's version of this event is telling. At his deposition, Mr. Bosworth did not believe he had even hired Mr. Duval for the job. (Exh. 4, pp. 23-29) Bosworth claimed that Mr. Duval's job had been created for Spalding Sports when it had "thousands" of products and huge functions to be managed. (Exh. 4, p. 74) Bosworth believed he had "inherited" Mr. Duval, whom he thought of as a member of the "old regime". (Exh. 4, pp. 23-29) In fact, Bosworth interviewed and hired Mr. Duval for the position, which Mr. Bosworth was responsible for creating. (Exh. 3, pp. 187-188) When confronted with the documents showing this, Mr. Bosworth seemed to concede he had hired Mr. Duval for the job which was created with his approval in May, and then deemed "superfluous" by him in July. (J. Bosworth 97-102, 158-161, 175-178). While Mr. Bosworth's testimony on these points is confusing and contradictory, it is clear that he had little regard for Mr. Duval from the start. He certainly knew Mr. Duval as someone he had "inherited" and who was part of the "old regime". It would be fair to infer that Mr. Bosworth hired Mr. Duval to placate Mr. Rist (who then retired in 2004) and to have someone to fill a planning and operations role until Reid Gorman arrived and came up to speed. Reid Gorman was hired on June 1, 2004, with the title of Director of Key Accounts/Sales Operations. (Exh.21) Gorman was 33 years old at the time and was a close friend of Mr. Bosworth. (Exh. 3, p. 60) Mr. Duval worked with Mr. Gorman until his termination in July. Mr. Duval testified that Mr. Gorman was doing Duval's job and replaced him. (Exh. 3, pp. 47-49) In June and July, Mr. Duval had to work under Mr. Gorman, who was paid a $200,000 salary. (Exh. 21) (Mr. Duval's salary was $127,000.)

Once Mr. Gorman came on board, Mr. Duval was essentially frozen out and kept out of meetings he should have been in. (Exh. 3, pp. 68-70) Mr. Gorman was non responsive to Mr. Duval and didn't really communicate with him. (Exh. 3, pp. 63-67) This occurred as Mr.

-9-

Gorman was involved with the same matters Mr. Duval was involved with. (Exh. 3, p. 74) Mr. Gorman would even meet with Mr. Duval's direct reports without Duval's knowledge. (Exh. 3, p. 76). Mr. Gorman took over Duval's work and in July, Mr. Duval was let go. (Exh. 3, pp. 77-78).

In March of 2005, just as Mr. Duval's severance was about to expire, Mr. Bosworth hired still another sales operations manager to work with Mr. Gorman - Scott Sirois, who was 34 years old. (Exh. 22) Mr. Sirois' salary was $75,000. (Exh. 22)

Defendant disputes that Mr. Gorman (and/or Mr. Sirois) replaced Mr. Duval, but the evidence shows that he did. Mr. Duval testified Mr. Gorman took over his work. (Exh. 3, pp. 47-49, 63-80). Mr. Penicka described Mr. Gorman's function in a fashion nearly identical to Mr. Duval's job. (Exh. 2, p. 58) Andrew Kelleher certainly believed that Mr. Bosworth was replacing Mr. Duval. He testified that Mr. Duval's termination resulted from Mr. Duval's "function" being consolidated with "another function" - national sales. (Exh. 10, pp. 62-67). This contradicts Mr. Bosworth's assertion that Mr. Duval really did not have a function at all - and that his job was superfluous and full of meaningless tasks that lower level employees could perform. (Exh. 4, p. 162). Mr. Kelliher understood Mr. Gorman to be assuming those tasks. (Exh. 10, pp. 62-67). But even Mr. Kelleher's explanation makes no sense. It is not a consolidation of two jobs to hire Mr. Gorman as a new employee in June and lay off Mr. Duval in July. Given Mr. Gorman's salary, it certainly was not a cost cutting measure. Mr. Sirois was then added to Mr. Bosworth and Mr. Gorman's staff the following March, at an additional cost of $75,000. The Company neither consolidated nor saved money. The Company replaced Mr. Duval at $127,000 per with two men in their 30's making $275,000 combined. Overall, the terminations which occurred in the sales department were not out of a need

or desire to reduce the number of employees or costs. Mr. Bosworth did not give Mr. Duval's salary as a reason for terminating him. (Exh. 4, p. 83) There were at least 6 new hires by Bosworth in the Department in 2004. (Exh. 4, pp. 40-41, 79). The new organization was even in Bosworth's terms, only "a little smaller", (Exh. 4, p. 79) The size of the sales force was not affected much, since the goal was to increase sales. (Exh. 4, p. 41) Even though Bosworth let go a number of sales people, including top regional managers, Richardson and Gielow, (Exhs. 5, 6) they were replaced, and replaced almost invariably by much younger individuals in their 30's. (Exh. 4, pp. 31, 79, 123) This included the hiring of Dennis Blake as director of public relations. (Exh. 4, p. 123) He was 30 years old and had never written a press release. (Exh. 4, p., 123) As Richard Gielow points out in his affidavit, he was replaced by Chris Reh (age 35) who had no sales management experience, needed Mr. Gielow's help after he had been terminated, and now works for Mr. Gielow. (Exh. 6) Scott Sirois, Bosworth conceded, "hadn't been in the golf business at all". (Exh. 4, pp. 70-71) [3] Despite this, Bosworth described the young replacements he hired as having qualifications that were "much more intense". (Exh. 4, p. 79).

Mr. Bosworth gave confusing and contradicting reasons for terminating Mr. Duval. He claimed Mr. Duval was not needed, was lacking in performance and had the wrong "attitude". (Exh. 4., p. 127) As for the need for the job, Mr. Bosworth conceded that he approved the creation of the job, and *two* individuals, Gorman and Sirois, ended up doing this work. As to performance and attitude, Bosworth presented nothing concrete and appears to be referring to his belief that Mr. Duval was doing things the *old* way. (Exh.4, p. 83) Mr. Duval notes that

---

[3] This is particularly odd since Bosworth testified that Bob Penicka told him he needed people with *golf* experience. (Exh. 4, p. 13). Mr. Duval of course had a lifetime of golf experience and had been part of a successful sales force in golf balls.

Bosworth never discussed these concerns with him. (Exh. 1)

Eventually, in late 2005, Mr. Bosworth was fired. (Exh. 4, p. 68). Sales under Mr. Bosworth went down. (Exh. 4, pp. 86-90) Scott Sirois continued to work in Chicopee until April 2006, when he left the Company voluntarily. (Exh. 22)

## ARGUMENT

## I. There are Genuine Issues of Material Fact That Demonstrate Age Discrimination

### A. The Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c)*. An issue is genuine where the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non moving party. *Zades v. Lowe's Home Centers, Inc., 446 F.Supp. 2nd 29, 36, (2006), Velez-Rivera v. Augusto-Alicea, 437 F. 3rd, 145, 150 (1st Cir. 2006)*. A fact is material where it has the potential to alter the outcome of the suit under the governing law if the dispute over it is resolved favorably to the non movant. *Zades at 36.* While the Court must view the facts in the light most favorable to the non moving party, drawing all reasonable inferences in that party's favor, if the moving party satisfies the initial burden of showing that no genuine issues of material fact exist, the burden then shifts to the non moving party with respect to each issue on which he has the burden of proof to demonstrate that a trier of fact reasonably could find in his favor. *Zades, at 36, Sands v. Ridefilm Corp., 212 F. 3rd 657, 661, (1st Cir. 2001)*.

The Plaintiff brings statutory discrimination claims under both *M.G.L.c. 151B,* and the ADEA. Although there are both federal and state claims, under present law, the summary judgment standard under both state law and federal law are essentially the same. See *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), Abramian v. President and Fellows of*

-12-

*Harvard College, 432 Mass. 107 (2000), McDonnell Douglas Corp., v. Green 411 U.S. 792 (1973), Wheelock College v. Massachusetts Commission Against Discrimination, 371 Mass. 130 (1976).* In each situation, the Plaintiff can present a prima facie case by showing that he was a member of a protected class, that an adverse action such as discharge was taken against him, that he was replaced or that work remained that he was qualified for, and the employer sought someone with similar qualifications. *Id* (see other cases below)  Once having shown that, the burden shifts to the employer to articulate a legitimate non discriminatory reason for the action taken.  Assuming the employer does so, the burden then shifts to the employee to show that the reasons provided were in fact a pretext for discrimination. *Id*

**B.    The Plaintiff Presents a Prima Facie Case of Age Discrimination**

In order to make out a prima facie case of age discrimination, Mr. Duval must show 1) that he is within the protected class; 2) that he performed his job within the legitimate expectations of the employer; 3) that he was terminated and 4) there was a continuing need for the services provided by the position for which he was discharged or that age was not treated neutrally in layoffs. *Zades at 37, Currier v. United Technologies Corp.,* 393 F3d 246, 254 (1st Cir. 2004).  Some Courts state this last element as "otherwise discharged because of his age. *Palasote v. Haggar Clothing, Co.,* 342 F.3d, 569 (5th Cir. 2003).   Defendants must then articulate a legitimate non-discriminatory reason for the discharge and the plaintiff must then show this is a pretext for age discrimination. *See supra, Reeves, Abramian, McDonnell Douglas, Wheelock College.*  There is no apparent dispute between the parties as to elements 1, 2 and 3, or as to the articulation of a legitimate reason for dismissal.  The controversy rests with the fourth element.  In a situation such as Mr. Duval's, where there is a claim of the need for a layoff

-13-

for economic reasons, evidence on the fourth element is closely tied to evidence of pretext for discrimination. Indeed it seems that the defendant has treated them as the same. In this case, the evidence cited above of the many discriminatory statements about age by Callaway leadership is both evidence of not treating age as a neutral factor and evidence that the reasons given for discharge were pretexts for age discrimination.

In addressing the fourth factor in the layoff or reduction in force context, courts have held that the employer must show that older employees were not treated differently than younger employees and that if younger employees were retained over older employees, it was for non discriminatory reasons. *Massarky v. General Motors Corp.*, 706 F.2d 111 (3rd Cir. 1983). That some within the protected class are retained, or are ever among the replacements, does not foreclose the issue, if there are other factors demonstrating age discrimination. See *Beirne v. Fieldcrest Canon, Inc.*, 74 FEP Cases 30 (S.D.N.Y. 1997).

With respect to replacement and available jobs, as long as the jobs being compared have similar functions and titles, the jobs of employees retained need not be the same as the jobs eliminated for a laid off worker to show discrimination. *Burger v. N.Y. Institute of Technology*, 94 F.3d 930 (2nd Cir 1996). It is sufficient if those absorbing the employee's duties are outside the protected class. *Miller v. Border Inc.*, 168 F.3rd, 308 (7th Cir. 1999), *Hamilton v. National Propane*, 276 F.Supp. 934 (W.D. Wisc. 2002). The First Circuit has held that the standard is satisfied if the plaintiff's job responsibilities are assumed by another employee, thereby showing the employer's continued need for the same services and skills. *Keirsling v. SER-Jobs for Players, Inc.*, 17 F.3d 755 (1st Cir 1994). See also *Seapier v. Johnson & Higgins*, 45 F.3d 724 (3rd Cir. 1995). (duties transferred to younger employees), *Christian v. Scor Reinsurance Co.*, 63 FEP 1219 (N.D. Tex. 1993). (duties distributed to three younger workers).

-14-

The fourth element is also satisfied by evidence of biased comments by the employer, of which there are numerous ones here. *Machenchick v. PB Power, Inc.*, 398 F.3d 345 (5th Cir. 2005). *Machenchick* is almost identical to this case. There, a vice president sent an email stating he had a plan "to strategically hire some young engineers and designers" and the company's business plan set a goal of the hiring of employees "whose mindsets reside in the 21st century". *Id* at 353-354. Further, echoing Mr. Bosworth's statements about Mr. Duval and numerous other older workers, the employer in that case complained the plaintiff had a "low motivation to adapt" *Id* at 354. These are exactly the kind of sentiments expressed by Messrs. Penicka, Bosworth and Kelleher.

In the present case, the evidence shows that age was not treated neutrally in layoffs, that a younger person was retained in the plaintiff's place that later, still another individual was hired to perform his work.

## C.    Age Was Not Treated Neutrally

The evidence that age was treated neutrally in Mr. Duval's termination is extensive. Defendants only attempt to deal with one piece of evidence, Mr. Penicka's statements. As noted above, Mr. Penicka's attitude was in no way isolated but represented the thinking of the officials brought in by Callaway in 2003 and especially that of Andrew Kelleher and Jamie Bosworth. It is Mr. Bosworth's opinions that are most relevant to Paul Duval's termination, and they reflect Mr. Penicka's expressed attitude perfectly. Mr. Bosworth said that people who had worked for the Company for years were "bleeding the company dry" and were "deadwood". He complained of "the old regime" and specifically identified Mr. Duval as part of it. After regional sales manager, David Richardson complained of possible age discrimination problems because of Mr. Bosworths' move to replace many salesmen, Mr. Bosworth fired him because he had "a bad attitude". He

-15-

then fired another top regional sales manager, Rich Gielow, and replaced him with an inexperienced 35 year old, who now works for Mr. Gielow.

Mr. Penicka's comments as are also probative of age bias in the company. Not only must one accept the version of these remarks related by Paul Duval for purposes of summary judgment, all of the testimony and circumstances make it clear that it did happen this way. Most of the witnesses substantially support Mr. Duval's version and they include individuals who are no longer with the company and not party to this litigation.

The brazen nature of Mr. Penicka's comments cannot be discounted. He was willing to go to a public meeting and announce his desire for a young management team, even if they weren't qualified. Further substantiating the outrageous nature of the comments is that a member of the audience, felt compelled to question Mr. Penicka's attitude towards older workers. [4]

The comments cannot be effectively discounted on grounds that they didn't specifically refer to terminations of employees at the level of the plaintiffs. Logically, anyone with Mr. Penicka's attitude towards the hiring of his top managers, was not likely to have a different attitude toward the hiring (or retention) of other managerial positions. The idea that Mr. Penicka was really just trying to reassure the community is not a piece of evidence – it is a self serving interpretation on Mr. Penicka's part. It is also no defense to age discrimination. A need to reassure the community is not a bonafide occupational qualification. The further assertion that Mr. Penicka terminated two "young" members of his OCM (Turzi, 42 and Esch 47) proving lack of bias is ridiculous, given that their replacements were Bosworth, 35 and Fry, 35. The Company

---

[4] Nor it is meaningful to argue as defendants do, that Mr. Penicka's thinking could not be reflected in the terminations of Bettencourt, Behaylo and Lonczak because those preceded the speech. Mr. Penicka was talking about the criteria he had for people he had already hired, who in turn made decisions about the plaintiffs.

constantly lauds its retention of Mr. Rist, age 62, neglecting to reveal that Mr. Rist had made it clear very early on that he was retiring anyway. (Exh. 23, pp. 88-89)

Mr. Penicka's comments therefore cannot be explained away as meaningless. They reflect the attitude of the Company President, and that attitude was echoed by other decision makers such as Kelleher, Lewandowski, Fry and especially Jamie Bosworth.

## D.   Mr. Duval Was Replaced

Defendant labors mightily to attempt to show that Mr. Duval was let go because there was no need for this position, despite having hired in 2004 and 2005 not one, but two individuals with virtually identical job titles.

It should be noted that the great deal of time and effort expended by the defendant to describe overall conditions of the Company and the gross numbers of individuals laid off have no relevance to the sales department or Duval's position. Mr. Bosworth made clear that his job was to increase sales and that he did not in fact, nor did he intend to make any significant reduction in the sales department. This is perfectly logical of course - the Company was looking to improve sales and would be unlikely to do so by reducing its sales force. Mr. Duval was hired in May, 2004 as Sales Operations Director. By June, 2004, Reid Gorman, a 35 year old friend of Mr. Bosworth was brought in for Key Sales Accounts/Operations. The following spring, just as Mr. Duval's severance was running out, the Company hired Scott Sirois (age 35) for the position of "sales operations manager".

There is clearly, at a minimum, a dispute of fact as to whether Mr. Duval was replaced. The fact that there were eventually two individuals performing sales operations is evidence that, at

-17-

a minimum, there continued to be similar functions and duties regarding the work Mr. Duval performed.

Mr. Duval, who was working in the same department as Mr. Gorman, testified unequivocally that Mr. Gorman was doing his job. This included work on national sales accounts. (Exh. 3, pp. 63-78) So much so was Mr. Gorman doing Mr. Duval's work that Duval found himself excluded from meetings he should have and normally would have been a part of. Mr. Gorman would meet with Mr. Duval's direct reports without Mr. Duval's knowledge. Defendant deceptively exaggerates Mr. Duval's testimony at p. 78 of his deposition as meaning that he didn't know what Mr. Gorman was doing. The question in that instance was: "other than whatever functions you had that Reid began to oversee, do you have any idea of how he spent his day for the most part"? The answer was: no. (Exh. 3, p.78) This is testimony that Mr. Duval didn't know what Mr. Gorman was doing, besides having taken over Duval's job, a far cry from not knowing what Gorman was doing.

There is independent evidence that Mr. Gorman essentially replaced Mr. Duval. It comes from none other than Andrew Kelleher, who had assumed the duties of director of personnel in the wake of Mr. Rist's retirement and Robert Penicka. Kelleher understood from Mr. Bosworth that Bosworth was combining Mr. Duval's sales operations function with the national sales function. Robert Penicka describes Mr. Gorman's job, just as Mr. Duval's was defined. Kelleher did not indicate in any way that Bosworth felt Mr. Duval's function was superfluous. It could be argued that the Company was saving money by "consolidating" these jobs, but any such notion is completely contradicted by the numbers. This was no cost saving consolidation. Mr. Duval made $127,000. Reid Gorman was hired in June, 2004 at $200,000 per year. The following March, Scott Sirois was added as Sales Operations Manager, what the *defendant* contends was Duval's

-18-

title, at $75,000 per year. This "consolidation" or "reduction" in "superfluous" functions, resulted in two individuals replacing one at more than double the salary, to say nothing of the cost of Mr. Duval's severance. Clearly cost was no obstacle to removing the "old regime".

Regional Sales Manager, Richard Gielow, whose job obviously was to deal with the sales department, observed that Mr. Gorman was doing Mr. Duval's work (Exh. 6)

The Defendant on this issue relies exclusively on Mr. Bosworth . Mr. Bosworth is either disingenuous or clueless as to what was going on. He first claimed he hadn't even hired Mr. Duval – that he had inherited him in a position dating back to Spalding Sport Worldwide. Confronted with the documentation that he had hired Mr. Duval and approved his job duties, he conceded he had done so but claimed the job he had created was really a low level meaningless job (at $127,000 per year), that he didn't realize, until weeks later, was "superfluous". If this were so, he would never have told Mr. Kelleher that he was "consolidating" Mr. Duval's function with Mr. Gorman's, nor could he then logically hire another sales operations manager in Scott Sirois. To make his testimony more confusing, Mr. Bosworth said he would have kept Mr. Duval anyway in some other capacity, if it weren't for what Mr. Bosworth conceived as an old fashioned approach to sales. [5]

It is fair to infer, if it is not obvious, that Mr. Bosworth hired Mr. Duval to keep the seat warm for Mr. Gorman until Gorman was hired and brought up to speed. Mr. Duval was then dismissed and eight months later still another young individual was hired to help perform the same job. Mr. Bosworth thought of Mr. Duval as someone he "inherited" and as apart of the "old

---

[5] Bosworth claims Mr. Duval resisted change and insisted on the old way of doing things. Mr. Duval testified that Mr. Bosworth raised no such objections to him. An affidavit is provided because Mr. Bosworth's deposition came after Mr. Duval's. (Exh. 1)

-19-

regime". Bosworth stated he believed years of experience were inherently meaningless, if not counterproductive.

Defendants dismiss Mr. Duval's value to the Company and imply that he kept barely missing layoffs because he was a nice guy. Many of these references are meaningless – they refer to prior decisions by prior decision makers, not part of Callaway, to *retain* Mr. Duval. Logically, a decision to retain Mr. Duval shows his value to the company – a company where he started on the factory floor, worked his way up with undisputedly good performance and to which remained loyal. In 2003, Mr. Duval, far from being laid off, was given a retention bonus to keep him with the Company during bankruptcy. When he had an opportunity to leave in 2004, he stayed, and Mr. Rist, at the time of the April 2004 layoffs, induced him to stay, telling him he had something for him. No doubt Mr. Rist was sincere, but once he was gone, Mr. Bosworth was left to his own design and made it clear he had no use for promises made in the past, or past performance.

Mr. Duval showed (and there is no contradiction of this) that there were, even outside of sales, several available jobs for him at Callaway that his extensive experience qualified him for – warehouse manager, director of material planning, director of procurement and factor/warehouse superintendent. (Exh. 3, p. 53) Like other plaintiffs in this case, he humbled himself to ask for lower positions. Defendant asserts it has no legal obligation to transfer or move an individual being laid off but every case they cite involved individuals who were not replaced and whose work did not continue to be performed. *See Simpson v. Midland-Ross Corp.*, 823 F.2d 937 (6th Cir. 1987); *Rose v. Wells Fargo and Co.*, 902 F.2d ad 1417 (9th Cir. 1990); *Early v. Champion International Corp.*, 907 F.2d 1077, (11th Cir. 1990); *Ridenour v. The Lawson Co.*, 791 F. ad 52 (6th Cir. 1986); *Parcinski v. The Outlet Co.* 673 F.2d 34 (2nd Cir. 1982); *Pages-Cahue v. Iberia Lineas Aereas De Espana*, 82 F.3d 533 (1st Cir. 1996); *Wilson v. Firestone Tire & Rubber Co.*,

-20-

932 F.2d 510 (6ᵗʰ Cir. 1990); *Barnes v. Gencorp, Inc.*, 896 F.2d 1457 (6ᵗʰ Cir. 1990).

This is not the case here.

Defendant's reference to Mr. Arturi's statistical conclusions are not relevant. Even if the statistical analysis were competent evidence under *Fed.R.Evid* 702, (which it is not, Mr. Arturi is a lawyer representing the defendant, not a statistician), it has no relevancy to these cases. Messrs. Penicka, Kelleher, Bosworth, Fry and Levandowski made individual decisions involving the plaintiffs. The possibility that other decisions were made by other managers who did not share the same prejudice will not help the defendant as to these cases. If there really were statistical case to be made, the Defendant could have presented expert evidence.

## E.  The Reasons for Mr. Duval's Termination are Pretextual

All of the above evidence is equally evidence that the reasons given for Mr. Duval's termination are were pretexts for discrimination. Even if Kelleher, Fry, Levandowski and Bosworth had not expressed similar attitudes as Mr. Penicka, Penicka's comments alone would be sufficient – he was the President of the Company and, in the presence of the other decisions makers, was willing to state to the public and the business community that he was hiring "young by design". *See Ercegovich v. Goodyear Tire and Rubber Co.*, 154 F3d 344 (6ᵗʰ Cir. 1998).

-21-

**II.    Partial Summary Judgment Would be Inappropriate**

Defendant contends that the Court should, even if it finds in favor of the Plaintiff on this motion, enter an order of some form of partial summary judgment on the grounds that the Plaintiffs would have lost their jobs eventually because many functions were later consolidated with the Callaway corporation in California. This is inappropriate. Defendant attempts to turn an issue of damages into one of liability. This argument calls for pure speculation as to what would have happened if the Company had never engaged in the discriminatory practices that it engaged in. When Callaway took over the corporation in September, 2003, the intention was to run it as a stand alone company. While there was consolidation of some functions early on, there was no effort to move any of the departments in which the Plaintiffs in this case were involved. After Mr. Penicka had installed, by his own definition, his "young by design team", by hiring Messrs. Bosworth, Kelliher and Fry, the Company did not in fact do well. Mr. Bosworth admitted that sales in fact went down over the next year under his supervision. Defendants imply that there was a decision in August of 2004 to consolidate all functions in California and to stop running Top Flite as a stand alone corporation, but the actual consolidation of the departments did not occur until the end of 2005. This was *after* Mr. Bosworth, after more than a year of running the department, created lower sales. Mr. Bosworth was fired. No one knows what would have happened in 2005 if the Company's sales had not been in decline and if so many experienced and successful employees had not been fired. Mr. Bosworth and Mr. Gorman were given control over a sales department which operated out of Chicopee and which was to be part of a stand alone company. They terminated numerous older employees, including their two most successful regional sales managers, and the result was that sales declined.

-22-

It was not only the sales department that failed. Mr. Kelleher left the corporation in early 2006 after it had been determined that there was a 3.3 million dollar inventory error. (Exh. 19, p. 148) Inventory control, as Mr. Kelleher indicated himself, is a basic function of cost accounting. Mr. Kelleher made decisions to terminate his most experienced cost accountants. It is pure speculation as to whether or not, absent these errors in sales and in accounting, there would or would not have been a decision to consolidate those functions in California. Likewise, no one knows how the Chicopee operation would have faired if the individual Plaintiffs in this case had been retained instead of dismissed. In the meantime, Callaway moved its production of golf balls to Chicopee.

Lastly, the idea of deciding on an end date for damages for each of the Plaintiffs ignores the possibility that in an age neutral environment, where qualifications and performance were judged fairly, it might well have been appropriate to continue to offer positions to the Plaintiffs whether in California or elsewhere. This would be particularly true in sales where the company had sales representatives or sales employees spread all across the country and working in different locations. There is no reason why any of the Plaintiffs could not have been offered jobs in California. It is pure speculation to try to decide now what would have happened had the company not discriminated in the first place. It should be noted as well that Ms. Turner who replaced Gary Lonczak, was still employed in Chicopee at least well into 2006 and through the course of this litigation. To this day, the Company continues to have at least one cost accountant on the premises. Several of the Plaintiffs had a wide ranging background. Mr. Duval had worked in virtually every aspect of the organization for more than 30 years. There were numerable jobs he could continue to perform even in the Company's production facility in Chicopee as has been noted above. Even the Defendant admits that there is more production of golf balls presently

-23-

going on in Chicopee than there had ever been before. This issue is a factual question as to the extent of damages and is not appropriate for summary judgment.

## III.    The Plaintiff Is Not Barred From His State Law Action by the Execution of the Release

The Defendants argue that summary judgment should issue on the Plaintiffs' state law counts under Chapter 151B on grounds that the Plaintiffs signed a release and received severance in exchange. In making this argument, the Defendants rely almost exclusively on federal cases interpreting federal law. See *Rivera Flores v. Bristol-Meyers Squibb Carribean*, 12 F.3rd 9 (1st Cir. 1998). Relying on federal law in this case is misplaced. Interpretation of law under the federal statutes is considerably complicated by the mere existence of the Older Worker Benefit Protection Act which Defendants presumably admit they violated. In deciding whether or not releases under other statutes bar a claim, federal courts have a different issue to decide because they have to determine the impact of the fact that congress has created one set of rules for age discrimination without creating any other rules for other forms of discrimination. The question of whether the release as executed by the Plaintiff would bar a claim under Chapter 151B is purely a state law issue. There is no appellate court body of law in Massachusetts on this issue, however, there is a complete set of standards that has been adopted by the Massachusetts Commission Against Discrimination. Defendants ignore these standards. The criteria utilized by the Commission to determine the validity of a release are as follows:

(1)     the clarity of the language set forth in the release (and the degree to which the release uses language which is understandable to a lay person);

(2)     whether the release specifically mentions the statutory provisions allegedly waived;

(3)     whether the complainant was aware of the existence of a claim of
        discrimination at the time that the release was executed;

(4)     the nature of the discussion between the complainant and the respondent at the
        time of execution;

(5)     whether opportunity for negotiation was afforded to the complainant;

(6)     whether complainant conferred with counsel prior to executing the release or
        was encouraged to do so by the respondent;

(7)     whether the respondent afforded the complainant a reasonable period of time
        to consider/reflect upon the release;

(8)     the degree of education of the complainant or the degree of knowledge
        possessed by the complainant regarding business practices; and

(9)     whether the release purports only to waive claims arising from acts that
        antedate the release or whether, conversely, the language of the release
        purports to waive prospective claims as well.

*Leo McCabe v. Tetley Inc.*, 22 MDLR 31 (attached);

*See also Berman v. Northeast Saving Bank* 10 MDLR 1582, 1585 (1988).

What is particularly important about the decision in this case is it makes clear that the

Commission is attempting to follow the standards of the Older Worker Benefit Protection Act. It

notes that the purpose of the act is to determine whether or not the release is knowing and

voluntary. The release is this case is deficient on the Commission criteria just as it is under the

OWBPA. This includes, in particular, the fact that the release does not specifically mention the

statutory provisions that are being waived. The release is also deficient in that at the time of its

execution, the Plaintiffs could not be expected to be aware of the existence of a claim of

discrimination. This is particularly true of Mr. Bettencourt, Behaylo and Lonczak, whose layoffs

occurred before Mr. Penicka made his statements in public to the Chicopee Chamber of

Commerce. But with respect to all of the Plaintiffs, they could not have been aware of all of the

-25-

evidence cited above which became apparent in the wake of their terminations some of which even came out in discovery itself. These include the above cited statements of Messrs, Kelliher, Bosworth, Fry and Levandowski. While some of the Plaintiffs knew some of these things at the time they executed their release, they could only be aware of one little piece or the other. Further, they obviously could not have known about the subsequent hire of two accountants in their 20's, the subsequent transition of Roseanne Turner into Gary Lonczak's position and the subsequent hire of Scott Sirois for the position previously held by Mr. Duval. As for the nature of the discussion between the Plaintiff and the Defendant at the time of the execution, the Plaintiffs were essentially left with a take it or leave it proposition and had no realistic opportunity for negotiation. With respect to the retention of benefits, since Massachusetts is following the Older Workers Benefit Protection Act, one should assume that as under the Act, retention of benefits is not a bar to alter claim. *See Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998).

In sum, the only definitive law in Massachusetts on this subject is McKay which uses the standards of the Older Worker Benefit Protection Act, and therefore, the releases are invalid and the state law claims should stand.

## CONCLUSION

For the reasons stated above, the Defendant's motion should be denied.

THE PLAINTIFF, PAUL DUVAL
BY HIS ATTORNEY

Dated: January 16, 2007

/ S / Maurice M. Cahillane
Maurice M. Cahillane, Esq.
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street - Post Office Box 9035
Springfield, MA 01102
(413) 737-0260; Fax: (413) 737-0121
BBO# 069660

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served this 16th day of January, 2007 on all parties, by hand delivery or First Class Mail, postage prepaid, to Jay M. Presser, Esq., Skoler, Abbott & Presser, 1 Monarch Place, Springfield, MA 01144

/ S / Maurice M. Cahillane

12084-050156\126926.wpd