*UNITED STATES DISTRICT COURT*
*DISTRICT OF MASSACHUSETTS*

|  |  |
|---|---|
| PAUL DUVAL,<br><br>                    Plaintiff,<br><br>vs.<br><br>THE TOP-FLITE GOLF COMPANY,<br><br>                    Defendant. | CIVIL ACTION NO. 05-30181-KPN<br><br>**DEFENDANT'S MOTION TO ALLOW<br>BRIEF IN EXCESS OF TWENTY PAGES** |

    NOW COMES Defendant, The Top-Flite Golf Company, and pursuant to the

Local Rules of the District Court of Massachusetts moves for permission to file a Reply

Brief to Opposition to Its Motion for Summary Judgment that is in excess of twenty

pages.  The Reply Brief to Opposition to Its Motion for Summary Judgment, attached

hereto as Exhibit A, seeks dismissal of the entire case and deals with a variety of issues

raised by the Complaint, including whether Plaintiff was laid off because of his age in

violation of the Age Discrimination in Employment Act and Chapter 151B, whether an

agreed upon Release of Claims bars the prosecution of the state law claim, and, in the

event summary judgment is denied, whether partial summary judgment limiting

damages is appropriate in light of subsequent reorganization and total discontinuation of

Plaintiff's former job duties.

    Allowing this motion will assist the court in ruling on this dispositive motion.

Respectfully Submitted,


  /s/ Jay M. Presser, Esq.
Jay M. Presser, Esq.
BBO #405760
Counsel for Defendant
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts  01144
Dated:  February 2, 2007          Tel. (413) 737-4753/Fax (413) 787-1941

<u>CERTIFICATE OF SERVICE</u>

 I hereby certify that a true and accurate copy of the foregoing *Defendant's Motion to Allow Reply Brief to Opposition to Its Motion for Summary Judgment* was served upon the attorney of record for each other party via electronic filing on February 2, 2007.

  /s/ Jay M. Presser, Esq.
Jay M. Presser, Esq.

*UNITED STATES DISTRICT COURT*
*DISTRICT OF MASSACHUSETTS*

| | |
|---|---|
| PAUL DUVAL, | CIVIL ACTION NO. 05-30181-KPN |
| Plaintiff, | |
| vs. | **DEFENDANT'S REPLY BRIEF TO OPPOSITION TO ITS MOTION FOR SUMMARY JUDGMENT** |
| THE TOP-FLITE GOLF COMPANY, | |
| Defendant. | |

## I.    The Facts

Defendant, The Top-Flite Golf Company ("Defendant", "TFGC" or the "Company"), filed an extensive Statement of Undisputed Facts.  *None of the facts as alleged by Defendant have been disputed by Plaintiff's filings, and accordingly, must be viewed as admitted.*  Thus, while Plaintiff filed a document captioned "Statement of Disputed Facts", Defendant has filed a Reply to said document which, point by point, addresses each of the alleged "disputed" facts contained in the Plaintiff's Statement. Said response, incorporated by reference herein, notes that most of the facts, at least those properly supported by the referenced citations[1], are, in reality, not in dispute at all. In a few occasions, the so called "disputed facts" are simply additional facts, most of which remain, following the Defendant's Response, undisputed.[2]  Indeed, there is only

---

[1] Plaintiff's Memorandum cites to facts in his Statement of Disputed Facts.  However, to the extent that the memorandum cites facts that are not properly supported by the cited materials (or in some cases, actually contradict the cited materials), they cannot be relied upon to defeat the Motion for Summary Judgment.  Nor can those, such as Duval's financial analysis of the Company's problems, that are not based on first-hand information.

[2] Thus, there is no dispute that a woman from Callaway indicated that she had never seen a company with so many employees with over 20 years seniority and that, at Callaway,

one fact properly raised and supported about which there is contradictory evidence, and while the court must accept the version of that fact most favorable to Plaintiff, it is not a material fact.[3]

At the end of the day, the facts, including the numerous admitted facts in Defendant's Statement as well as the additional new facts added by Plaintiff, simply would not support the conclusion that the Plaintiff was terminated due to his age.

## II.  Reply Argument

### A.  No Facts Point to A Discriminatory Intent In Duval's Layoff

Defendant's Statement of Undisputed Facts sets forth 54 specific facts relating to the Plaintiff's layoff.  None has been disputed in Plaintiff's Statement of Disputed Facts.  Despite the absence of such evidence, or perhaps because of it, Plaintiff attempts to build a case that Callaway's entire management was infected by age bias, relying upon the recitation of a variety of comments that purportedly show this discriminatory mindset

---

she was accustomed to people who had been there less than 20 years.  It is the relevance of that fact that is disputed.

[3]The only actual disputed fact relates to the claim at ¶ 15 of the Plaintiff's Statement of Disputed Facts, where, discussing the possibility of a potential age discrimination suit from an older field salesman, David Richardson alleges that Bosworth responded that "you should just fire a couple of young guys along with the old ones and no one would notice."  Bosworth had denied making that statement and said that he indicated he wasn't concerned about discussing non-existent lawsuits.  The affidavit of another Plaintiff witness, Gielow, also does not assert that Bosworth told managers to layoff young people but rather asserts that "Mr. Bosworth's response was that we should do what we needed to do to cover ourselves."  The court must, of course, accept Richardson's uncorroborated assertion for purposes of this motion.  However, as noted in the response to the Defendant's Statement of Undisputed Facts, "Accepting Richardson's account would support the conclusion that Bosworth suggested that a few younger people be unjustly terminated to assist in the defense of a lawsuit brought by older workers eliminated when, according to Richardson's phrasing, the "dead weight" was culled.  It does not support a directive that someone would be fired because they were old.  Thus, at best, it is a cynical suggestion as to how the dead weight in the sales force could be eliminated without incurring a successful lawsuit.  At most, it shows that Bosworth was willing to sacrifice some unfortunate younger employees to rid the Company of 'dead weight.'"

against older employees.  Thus, Plaintiff asserts that beyond Robert Penicka's statement at the Chamber of Commerce, there are other statements and actions that demonstrate this so called deep and abiding age bias.[4]  Those comments, neither individually or cumulatively, demonstrate no such thing.

Plaintiff also presents the fact that two field sales managers who claim they were performing well, were terminated by Bosworth, the same individual who decided to layoff Duval.[5]  However, there is no evidence presented that Bosworth disproportionately terminated older sales managers or older field sales personnel.

[4]Defendant's Statement of Undisputed Facts ¶¶ 64-71 contains details of Robert Penicka's remarks at the Chamber meeting.  The Plaintiff did not properly challenge any of the facts alleged therein, but merely quoted from ¶ 69 and stated "The nature of Mr. Penicka's statements at the Chamber of Commerce are not substantially disputed."  (Plaintiff's Statement of Disputed Facts ¶ 11)  Nevertheless, at footnote one of his Memorandum Plaintiff attempts to circumvent the requirements of Local Rule 56 and contest the additional facts submitted, all of which are properly supported by admissible, and undisputed evidence.  Thus, he asserts that "it is highly unlikely" that a Chamber member would ask the new president a question about age. He then indicates that it is notable that Penicka's "version" of what was said is supported only by decisionmakers.  Defendant was clear that to the extent there was any conflict the court was obligated to credit the version most favorable to Plaintiff, and assumed it was the Duval version. (*See* Defendant's Statement of Undisputed Facts ¶ 69)  However, Plaintiff misconstrues the nature of summary judgment if he is asserting that no other admissible evidence, if uncontradicted, can be submitted and relied upon.  Thus, Duval indicated that Penicka spoke for about ten or fifteen minutes but could only recall two sentences.  (Duval Dep. p. 195)  If not in conflict, the testimony of others can likewise be submitted.  Thus, despite counsel's opinion as to the probability, numerous witnesses recalled that there was, in fact, a question from a Chamber member.  This did not only include decisionmakers, but Christine Conti (p. 25) and Darlene Orciuch (p. 17).  Both were non-supervisory former employees, whose depositions were taken by Plaintiff when they were no longer employed.  Their testimony, as well as the testimony of Rist (not accused of making any discriminatory decision) and the other managers can properly supplement the two sentences recalled by Duval.  There is nothing in the record, not even an affidavit from Duval, indicating that no one from the floor asked a question. Accordingly, there is no basis not to accept, as an undisputed fact, that such a question was asked.  Similarly, while Duval's account of what was said by Penicka, to the extent it contradicts others, governs, that does not preclude Penicka from testifying in court, or in a summary judgment affidavit, as to matters that occurred before the comment was made or his thought processes.

[5]As discussed below, their testimony should be excluded.  In any event, it is not probative of age discrimination against Duval.

There is no statistical breakdown showing the ages of those managers released and those retained by Bosworth.[6]   Moreover, Plaintiff was not a part of the field sales organization at all.[7]  Similarly, Plaintiff points out that some relatively young employees (one of whom is actually in the protected age bracket) were hired by Bosworth. However, that evidence is not accompanied by any information that would make such data relevant, such as evidence that these individuals were the new hires cited, or were the *only* employees hired by Bosworth (much less appropriate evidence that would allow a meaningful assessment of such data, including the ages of qualified candidates for any vacancies for which these people were hired).

The fact that Bosworth agreed to take Duval into his department, which of course belies any claim of age discrimination, when his job was eliminated soon thereafter[8], is

---

[6]Materials before the court show, for example, that Ed Drozd, whom Bosworth praised and never terminated, held the same position and was the same age as Richard Gielow.  A review of the Answers to Interrogatories show numerous salesmen in their fifties who continued to work for Bosworth through his own relatively brief tenure.  Thus, the fact that some people were hired who were not in the protected age bracket, and that some people were terminated who were, is utterly meaningless.

[7]Thus, even if the discharge of the two is presumed to be the result of a stereotype view on Bosworth's part that young men were able to be good salesman, a fact disputed by the evidence including his praise of some older salesmen, it would not indicate that he didn't believe an older employee could be successful in a desk job in Sales Operations in Chicopee.

[8]It is, of course, irrational to assert that Plaintiff was "hired" by Bosworth in April, notwithstanding his age, and then terminated by him three months later *because* of his age. This common sense truism, adopted as the "same actor rule", belies any claim of discrimination. Dziamba v. Warner & Stackpole LLP, 56 Mass. App. Ct. 397, 406, 778 N.E.2d 927 (Mass. App. Ct. 2002) (". . . it is improbable that the same persons who hire or promote someone already in an older age bracket will suddenly develop an aversion to older people.")  *See also*, Wexler v. White's Fine Furniture, Inc., 246 F.3d 856, 866-867 (6th Cir. 2001) ("[W]here the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer").  On the other hand, it is not unlikely, as Defendant has stated, that Bosworth, who had never worked with a company that had a dedicated Sales Planning department, used that period to assess the value (or lack thereof) of

4

dismissed by Plaintiff, although without a hint of proof, as an effort to placate Vaughn Rist.  (Plaintiff Brief p. 9)

Articulating what to Plaintiff lies at the heart of his grievance, Plaintiff asserts that "it is fair to infer, if it is not obvious, that Mr. Bosworth hired Mr. Duval to keep the seat warm for Mr. Gorman until Mr. Gorman was hired and brought up to speed."  (Plaintiff Brief. p. 19)  Plaintiff notes that Gorman was hired on June 1, 2004, with the title Director of Key Accounts/Sales Operations", was young, and "…a close friend of Bosworth."  (Plaintiff Brief p. 9)

The Defendant reasserts its position that Duval was not replaced by Gorman or anyone else and he cannot, therefore, establish a *prima facie* case.[9]  (*See* Defendant's Statement of Undisputed Facts ¶¶122-129, 132, 150-154, *none of which were properly disputed* in Plaintiff's Statement of Disputed Facts.)  Thus, although the brief claims that Sirois was a replacement, contrary to the facts Defendant cited with reference, Sirois' name is not mentioned anywhere in the Plaintiff's Statement of Disputed Facts. Likewise, despite detailed facts indicating the differences in Reid Gorman's job and the Plaintiff's in the Defendant's Statement of Undisputed Facts, none of those facts are

---

the duties Plaintiff was to be doing, and was then able to determine that the duties were largely unnecessary.

[9]Plaintiff incorrectly asserts that the fourth prong of the *prima facie* can be demonstrated by showing that "there was a continuing need for the services provided by the position for which he was discharged."  That is the standard for a simple discharge case, not for a case involving a reduction in force.  Thus, while Plaintiff cites Currier v.United Technologies Corp., 393 F.3d 246, 254 (1st Cir. 2004) in support, that case shows the court using a different standard.  Thus, the court noted that "[i]n the context of a RIF," the fourth prong could be met by showing not merely a continuing need for the services, but rather that "younger persons were retained in the same position or that the employer otherwise did not treat age neutrally."  A similar approach is used under M.G.L. c. 151B.  *See* Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 42, 825 N.E.2d 522, 532 (Mass., 2005).  The district court case cited by Plaintiff did not entail a reduction in force situation.

properly contested.  Reid Gorman, unlike Sirois, is mentioned at ¶ 20 of Defendant's

Statement of Undisputed Facts asserting that David Richardson "*was told that his job*

*was being eliminated to make way for the hiring of Reid Gorman, age 34, a friend of*

*Mr. Bosworth's"*.  However, there is absolutely no discussion as to Gorman's job duties

for Defendant nor anything that would contradict any of Defendant's Statement of

Undisputed Facts on this matter, particularly the assertion that Gorman was hired to

oversee key accounts and big box sales based, in large part on his relationship with

such customers.  (Defendant's Statement of Undisputed Facts ¶ 123-125)  Undeterred,

Plaintiff presses on to claim in the memorandum that he was replaced by two people,

Gorman and Sirois.  This assertion, which appears in the memorandum, at page ten, is

based on his own testimony[10], as well, purportedly, as the testimony of both Penicka

and Kelleher which, according to Plaintiff, show that Gorman, hired as Director of Key

Account & Sales Operations, replaced Duval.  However, Duval's testimony is not

properly supported, as his deposition makes clear.

Penicka did not indicate that Gorman was hired to replace Duval, but rather that

Gorman "*was hired to do what we call the national sales account sales – to call on the*

---

[10]In deposition, Duval admitted that except for the time Gorman was overseeing his work, he was unaware of what duties Gorman was performing.  (Defendant's Statement of Undispued Facts ¶  132)  Plaintiff's deposition testimony clearly indicates his knowledge as to Sirois is based entirely on hearsay, expressly what he was told by others. (*See* Plaintiff Ex. 3, p. 48)  Based on such alleged hearsay testimony, he asserted that Sirois began within a few weeks of his departure. The actual evidence shows that Sirois commenced employment more than seven months later, a fact seemingly accepted by Plaintiff.  (*See* Defendant's Statement of Undisputed Facts ¶ 154 and supporting documentation).

There is no proper evidence disputing Defendant's assertion, properly supported, that when Sirois was hired in March of 2005, for about $45,000 less than Plaintiff had earned, his duties were different. Defendant's Statement of Undisputed Fact ¶154. Lastly, even if Sirois was an actual replacement, as noted in the original memorandum, it would not be unlawful for a company with financial difficulties to layoff a high paid manager and, six months later, replace him with a significantly lower paid employee.

*big sporting good chains, the big retailers*" as well as planning operations.  Thus, contrary to the Plaintiff's claims, Penicka's testimony also makes it clear that Gorman was hired to sell to the big retailers, a critical function representing 50% of the Defendant's business (Defendant's Statement of Undisputed Facts ¶ 123).  This was not a function that Duval had ever performed!  Thus, even assuming *arguendo* that the plan was to have a single person replacing Lowe and Duval performing both Key Sales and Sales Operations, there is no basis for concluding that Gorman's selection for such a position, rather than Duval's, was due to his age.  Thus, it is quite clear that Bosworth saw the key account sales, which accounted for a large portion of the revenues, as the critical function.  If a single person was going to be hired for these dual roles, it surely would be Gorman.  Thus, there is no evidence that Duval was Gorman's equal in terms of qualifications to selling golf balls to the big box stores. [11] Gorman, despite his youthfulness, had already enjoyed a successful career *as a salesman,* including winning the Callaway Salesman of the Year and being a National Sales Manager for Callaway.  He had the relationship with these large retail customers by virtue of his prior sales positions.  (Defendant's Statement of Undisputed Fact ¶¶ 122, 125)  Despite Duval's extensive experience in the sales department, his

---

[11]The Plaintiff's attempts to equate Duval's job duties with Gorman's fall are missing in detail and far too vague and conclusionary to carry the day.  Thus, Plaintiff cites the affidavit of Richard Gielow, which refers only "to my observation".  Gorman had a *similar* role as Duval had.  There is no indication how much he was able to observe, for what period, or what actual tasks were identical or different or what is meant by "similar".  In short, it is too vague to be of any use.  Significantly, *although Defendant's assertion that Gorman was primarily hired to be responsible for sales to Key Accounts given his experience and relationships with them, not a single affidavit, not Gielow's, not Richardson's, not even Duval's, denies that, as asserted Gorman was actively handling sales to the Company's key accounts.  Not a single affidavit, not Gielow's, not Richardson's, not even Duval's assert that Duval had been performing those crucial duties.  That would have been relevant evidence.*  Absent that, general conclusionary claims to those with limited first-hand knowledge fail to create a genuine issue of material fact.

experience was principally on the operations or marketing end, and not closing sales deals with major accounts.  Indeed, the only time Duval had done actual direct selling was when he was in charge of custom balls, selling the balls with a company's logo to a company for promotional purposes.  However, not only was that many years earlier, the customers for that niche market were institutions wanting to distribute promotional golf balls with their names, not large retailers.  Indeed, critically, there is no claim made by Duval, or those supporting him, that Duval had Gorman's history of selling to major retailers, or that he had the relationship with the "big box" customers that Gorman had, and that Bosworth cherished.  Bosworth has clearly articulated that Gorman was hired for his position because he valued his relationships with, and ability to sell, to big box sales.  Even if one assumes that the plan throughout was to have one person responsible for selling to Key Accounts and also taking care of sales operations, there is nothing to suggest that the selection of Gorman for such position was discriminatory.

In any event, there is no evidence that the original plan, contrary to what Defendant has asserted, was for Gorman to assume Duval's functions.  Thus, Kelleher's testimony that Gorman's position as Director would include sales operations as well as key account sales is *consistent* with Defendant's Statement of Position, and the fact that from the time Duval was given his position the plan was for him to report to a Director of Key Account & Sales Operations.

Similarly, contrary to Plaintiff's claim in his memo, Andrew Kelleher did not state or infer that Gorman had replaced Duval[12].  Rather Kelleher, recalling what Bosworth

---

[12]The Brief cites Exhibit 10, pp. 62-67 in support of this assertion.  However, those pages are not contained in the materials produced, and the court can disregard the assertion for that reason.

said about the elimination of Duval's position, indicated that Mr. Bosworth "thought that

he could take "Mr. Duval's function and combine it with the national sales function."

(Kelleher p. 65)  That isn't an indication that Gorman, hired primarily to sell to big box

stores, was a replacement for a dedicated sales operations manager.  It doesn't even

indicate that, following the decision to layoff Duval, Gorman assumed Duval's duties to

an extent greater than any other sales manager.  It is entirely consistent with

Defendant's assertions, for as the Defendant clearly articulated at ¶ 135 of its

Statement of Undisputed Facts, by July 2004:

> Bosworth came to view 70% of Duval's job as entirely unnecessary.  While the
> company would continue to require some lower paid person to prepare some
> reports and generate some spreadsheets, the bulk of the job, and the only
> portion of the job that had justified Duval's six figure salary, was the designing
> and developing of sales programs.  However, Bosworth did not believe that
> anyone other than his sales managers and himself should be preparing the
> programs.  (Bosworth 161-162, 174)  It made no sense to Bosworth for sales
> programming to be prepared by sales operation personnel.  (Bosworth 175)

and ¶ 152  "Gorman did not directly take over the functions of Duval, although he, and

other managers, did perform the sales planning function, consistent with how Bosworth

wanted sales planning done."  Thus, Kelleher consistent with the above, simply noted

that Bosworth thought that Duval's duties (at least the 30% Bosworth saw as useful)

could be done by the national sales function, *i.e.,* Bosworth and the sales managers,

which included Gorman.

Plaintiff attempts to describe the changes occurring utilizing solely a self-

centered myopic view of the changes.  Thus, he decries Kelleher's explanation that

Gorman's was a merged job as "making no sense", noting that he hired Gorman in

June and let go of Duval in July, and argues that this "certainly wasn't a cost savings"

since Gorman was paid more than Duval.  Such efforts ignore changes affecting individuals other than himself.  Thus, he simply ignores the still undisputed fact (Defendant's Statement of Undisputed Facts ¶ 129) that when Gorman was hired as Director of Key Account & Sales Operations Bosworth simultaneously terminated the incumbent Manager of National Key Sales, in Duval's words, "a kid named David Lowe".  Thus, Lowe's position, which paid more than Duval's, was eliminated in June and assumed by Gorman, who as a Director, was, at the same time, made *responsible* for the oversight of Duval and Sales Operations. To the extent Gorman was a replacement for anyone, it was neither Dave Richardson nor Duval but Lowe.  Indeed it is undisputed that taking over the responsibility of key account sales was the reason for the hiring of Reid Gorman, and the critical part of the job, at least in Bosworth's viewpoint.  Any oversight of sales operations by Gorman was a very distant secondary function.  Even if the evidence supported an assertion that Gorman's position was a combination of Lowe's and Duval's positions planned from the beginning, it is clear that key account sales was the driving force in the hiring of Gorman.

While Plaintiff's brief boldly asserts that "Bosworth conceded that he approved the creation of the job, and *two* individuals, Gorman and Sirois, ended up doing his work" (emphasis in (original)) there is, not surprisingly, no citation to any such testimony provided and no factual basis for the assertion.  In the same manner, while Plaintiff asserts that Bosworth "presented nothing concrete" regarding his perceptions[13]

---

[13]Plaintiff's Statement of Disputed Fact ¶ 25, asserts that while not true, it *"was Mr. Bosworth's perception that he was stuck in "old ways".*  In its Opposition, Defendant agrees that it was Mr. Bosworth's perception, and notes that such was its claim.  Indeed, if Bosworth acted because of said perception, it is not because of age, absent a showing, lacking here, that he perceived all older employees as similarly stuck.

about Duval's attitude, in fact, an illustration of something concrete is contained at Defendant's Statement of Undisputed Facts at ¶¶ 138, 139 and the materials cited therein and was not disputed by Plaintiff.

In the end, however, even if one believes Duval's own underlying belief, *i.e.*, that when his International Sales position was eliminated he was given the position by Bosworth "to keep the seat warm" until Bosworth's "good buddy", Reid Gorman, could come on board and be brought up to speed, it would demonstrate that Duval's treatment was unfair, callous, and even an example of blatant cronyism. Establishing any or all of these would not, as noted in the original memo, demonstrate a violation of law. Thus, assuming *arguendo* that Plaintiff is correct, and that he was saved from a layoff in April when his job in International was eliminated[14], only to be discharged soon thereafter to make room for a buddy, it would not constitute age discrimination. *Cf.* Foster v. Dalton, 71 F.3d 52, 56 (1st Cir. 1995).

## B. Claims of A Discriminatory Corporate Mindset Are Unsupported by Fact

### 1. Ambiguous Statements and Comments about Seniority Don't Establish a Discriminatory Corporate Mindset

Plaintiff attempts to substitute a vitriolic claim that "Callaway brought with it a deep and abiding age prejudice" for actual facts showing that the actions taken by Defendant were discriminatory. Thus, without any real evidence that the layoffs in general, or his in particular, was motivated by discriminatory animus based on age, Plaintiff seeks to assert that the entire Company, and implied all its decision making

---

[14]Plaintiff does not contest the fact that his position was lawfully eliminated in April of 2004, and that he was saved from layoff at that time only by virtue of Bosworth's agreement to place him in the sales organization.

processes, was tainted by a discriminatory mindset.  However, there is absolutely no factual basis for such an assertion.

Indeed, significantly, there is not even a claim that the Defendant engaged in a pattern or practice of age discrimination, which one would expect if a new management held the deep and abiding prejudice Plaintiff claims.[15]  Nor is there any statistical evidence that layoffs, as effectuated, had any disparate treatment on older workers, which would likewise be expected if management harbored such patent animosity towards older employees.  Indeed, there isn't even evidence of a disparate layoff of older workers within any subgroup overseen by a particular decisionmaker Plaintiff asserts was infected with such bias.  Thus, for example, the Plaintiff attempts to build his case on comments admittedly or allegedly made by James Bosworth, the Vice-President of Sales, comments relating to the field sales force.  However, there is no evidence of actions taken that would corroborate the discriminatory interpretation Plaintiff seeks to place on ambiguous or entirely innocent remarks, such as referring to the prior management as the "old regime".  Thus, Plaintiff does not even offer any statistical evidence that under Bosworth's direction, the sales department, in general, or the field sales staff that was the subject of Bosworth's comments in particular, got younger as a result of the actions taken by Bosworth.  Not only is there the absence of such evidence, the evidence presented by Defendant, which is undisputed, shows that the average age of the Chicopee salaried workforce actually *increased* after the April

---

[15]Such a claim would require evidence that there be systemic discrimination.  *See*, Lopez v. Metropolitan Life Insurance., Co., 930 F. 2d. 157, 160 (2d Cir.) *cert. denied* 502 U.S. 880, 112 S. Ct. 228 (1991).  Isolated instances, which would include the age related separations of four (or even six) individuals due to their age, would not suffice given the widespread reductions.  *Cf*. Teamsters v. United States, 431 U.S. 880, 97 S. Ct. 1842 (1977).

layoffs and *that there is a higher percentage of office employees in the protected age group since Callaway took over the operations than there was before*. (*See* Defendant's Statement of Undisputed Facts ¶¶ 97, 98)  After two and one-half years of being operated by Callaway, thirty-five of the 100 exempt salaried personnel employed were over the age of fifty. (Defendant's Statement of Undisputed Facts ¶ 37)

Despite the absence of such evidence, or perhaps because of it, Plaintiff attempts to build a case that Callaway's entire management was infected by age bias, relying upon the recitation of a variety of comments that purportedly show this discriminatory mindset against older employees.  Thus, Plaintiff asserts that beyond Robert Penicka's statement at the Chamber of Commerce, there are other statements and actions that demonstrate this so called deep and abiding age bias.

The comments by Penicka at the Chamber of Commerce meeting, as well as the background of his statements and the actual parameters of the changes he made to his own senior staff, none of which have been disputed, were addressed in detail in the original brief, and need not be repeated.  To that breakfast remark, Plaintiff now adds a variety of comments that, for the reasons cited below, neither individually or cumulatively demonstrates the purported age bias of the speaker, much less a corporate mentality of age bias.

As discussed in greater detail below, the comments patently fail to create a material issue of fact regarding the purported corporate age bias for two primary and distinct reasons.  First, many of the comments relate to longevity with the company (seniority) and not to age at all.  Secondly, those that do refer to age at all, such as references to the "old regime" are, at most, ambiguous remarks that are susceptible to

interpretations which are in no sense discriminatory.  As a matter of law neither category of remarks creates a material issue of fact pertaining to Plaintiff's claim.

Thus, the First Circuit has expressly not allowed references to age to support an age bias claim, even at the summary judgment stage, when such comments, even if made, may realistically be interpreted in a way that does not reflect a desire to make age based decisions.  Thus, in Gonzalez v. El Dia, Inc., et al., 304 F.3d 63, 69-70 (1st Cir. 2002), the First Circuit Court upheld summary judgment for the employer notwithstanding an alleged "pattern" of workplace remarks demonstrating age-based animus.  In language applicable to Plaintiff's efforts here, the Court stated:

> Upon closer examination, however, the stray remarks she identified afforded an inadequate foundation for the requisite discriminatory intent.
>
> In the first place, "stray workplace remarks," as well as statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus.  See, Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001); Laurin v. Providence Hosp., 150 F.3d 52, 58 (1st Cir. 1998) . . . .
>
> Secondly, it is far from clear that the alleged remarks bespeak any age-based animus at all.  See, Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 583 (1st Cir. 1999) (noting that "a statement that plausibly can be interpreted two different ways-one discriminatory and the other benign-does not directly reflect illegal animus") (emphasis added); Speen v. Crown Clothing Corp., 102 F.3d 625, 636 (1st Cir. 1996) ("'[A]mbiguous remarks, tending to suggest animus based on age, are insufficient, standing alone, to prove an employer's discriminatory intent.'") (citations omitted; emphasis added); Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 329 (1st Cir. 1996) (same).
>
> Some statements, such as those made by Mr. Mercado, merely displayed a measure of surprise that Gonzalez was still employed at El Dia, without either asserting or implying that she was too old to be working.  Moreover, Mr. Mercado's alleged use of the salutation "Mom" -- though no doubt insensitive, perhaps even rude -- hardly constituted a self-sufficient foundation for an ADEA claim, especially since these particular attributions -- motherhood and advanced age -- plainly are not synonymous.

Similarly, the remarks Ms. Ferre allegedly directed at Gonzalez are reasonably susceptible to interpretation simply as descriptions of the somewhat dowdy appearance and demeanor which Gonzalez herself acknowledges.  Moreover, the Spanish phrase "manias de vieja" ("old ways") did not unambiguously connote that Gonzalez was old, let alone too old, but rather that she acted in ways which did not appear in keeping with a person her age.  *See, e.g.,* Pearson v. City of Manhattan, 33 F. Supp. 2d 1306, 1315 (D. Kan. 1999) (holding that phrase "old ways" not evidence of ADEA age-based animus, as such terms "apply more to a person's state of mind than to a person's age"); Martin v. Ryder Distribution Res., Inc., 811 F. Supp. 658, 664 (S.D. Fla. 1992) (observing that simple references to the plaintiff-employees-as "good old boys" and "old-fashioned"-are insufficient evidence of age-based animus under ADEA), *aff'd*, 16 F.3d 1232 (11th Cir. 1994).  Nor did any other statement, attributed either to Mr. Mercado or Ms. Ferre, unambiguously communicate an age-based animus. Rather, their remarks are readily susceptible to interpretations which are in no sense discriminatory.

For the same reason, as discussed individually below, the statements relied upon by Plaintiff do not suffice to create even a material issue of fact.

As indicated, several of the comments do not relate to age at all, but are comments that, in one way or another, purportedly reflect a bias against (or in some cases merely a lack of respect for) the seniority of the employee.  Indeed, throughout his argument, the Plaintiff continues to intertwine a disregard or disdain for seniority with animosity based on age, despite the facts that these are now definitively recognized as distinct concepts.  Hazen Paper Company v. Biggins, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993).  The significance and rationale of maintaining that distinction is clearly demonstrated by the facts here.  Thus, both Bettencourt and Behaylo, cost accountants released in April of 2004, had more seniority than Levandowski who was retained.  Even if their greater seniority was admittedly disregarded, and indeed even if there seniority was held against them, Levandowski was older than both.  Thus, even if the decision making process was tainted by a discriminatory bias against those with

15

seniority, which is denied, it clearly did not equate to age discrimination, since the less senior and older Levandowski was the only cost accountant retained.

Beyond the legally incorrect assertion that bias against senior employees is the same as bias against older employees is the underlying reality that, permeating Plaintiff's argument is the incorrect implication that the age discrimination laws were violated because TFGC failed to give sufficient weight to the past service of the Plaintiff, and others. Thus, for example, the Plaintiff's memorandum, at page four, attacks Mr. Bosworth's belief that longevity in a particular job is not the same as relevant experience, as if such a belief was demonstrative of age discrimination in any fashion. Similarly, the fact that Kelleher indicated that "anything that happened before 2003 [when the new company was formed] was meaningless" is cited to support the assertion that even at deposition Kelleher "could not restrain his discriminatory attitudes…" (Plaintiff Brief, p. 5)[16]  The Defendant is taken to task for terminating Plaintiff's employment, notwithstanding the undisputed evidenced that it was losing millions of dollars, without Defendant's fully exploring what other positions he could possibly do. Such an argument is based on the underlying, incorrect, implication that there was some legal obligation for the Defendant to try to continue to employ Plaintiff in these circumstances, presumably in consideration to his past service.  The failure to search for a reason or excuse to continue to employ an employee, when it is clear that the employee is not needed in his own job, even if they were capable of performing other

---

[16]Other absurd examples cited include the fact that he referred to the organizational chart as the one he "inherited", and the fact that there were a lot of legacy folks that had been around with Spalding.  Both were obviously true.  Moreover, these comments, like the others described in greater detail below, are not age related at all.  At most they reflect a lack of respect for those who had worked for the bankrupt predecessor company.

jobs, simply is not indicative of age discrimination.  When a company is obviously looking to reduce headcount, and if the job an individual was performing is no longer required, why would the company be expected to review what else the employee might be able to do?  The failure to do so raises no bona fide suspicion that the actions are motivated by consideration of age.

Nor would a company be expected to maintain the services of an employee because it might, at some later point, be necessary to hire additional staff to perform some of the more mundane tasks, leaving the remaining experienced employees more time to perform the duties that actually require their skills.  Thus, even if the court were to assume that in April 2004 the Company knew that several months later it might need an entry level accountant (a fact clearly not supported), why would a company losing millions of dollars be expected to not immediately eliminate more than $100,000[17]  in salary and hire a lower cost entry level new college graduate when and if the need arose.  Even discarding the fact that companies sometimes end up cutting too deeply, without any sinister intent, and must then adjust when the capacity of the remaining staff to handle the work becomes clearer, even such a planned action would not raise the specter that the initial decisions, or the decisions not to recall the higher paid experienced accountant, was based on age rather than a desire to reduce costs.

In a like vein, why would Tom Fry, who *knew* that Roseanne Turner had IT expertise at TFGC, and could at least temporarily handle the transition duties involving

---

[17]Indeed, the savings came from the layoffs of at least five people by Kelleher, the three cost accountants, a tax accountant, and a business analyst.  To the extent the two new graduates were "replacements', a wholly inaccurate term in this context, they replaced all five for what was being spent on Bettencourt alone.

the Ben Hogan line, and who *knew* that the Ben Hogan line was going to be handled by

Callaway (although the timing changed, the decision never did), be expected to review

Lonczak's job history to learn whether he had performed such duties for another

company many years before.  What inference of age discrimination can be inferred from

a failure to do so?  None.[18]

### 2.  Statements regarding "Deadwood", "Seniority" and an Absenteeism Study Fail to Demonstrate Age Bias

Moving to specific "remarks", Plaintiff's reference a statement by an unidentified

woman from Callaway's personnel department that she had never seen a company with

so many employees with over 20 years seniority and that, at Callaway, she was

accustomed to people who had been there less than 20 years.  The statement does not

even indicate that it was perceived as a negative, as opposed to positive observation.

In any event, it is not evidence of a corporate age bias.

Nor are the alleged statements of Kelleher or Bosworth referencing "dead weight'

or "deadwood."  Plaintiff's Statement of Disputed Facts, as his memorandum, incorrectly

claims that Kelleher told John Bettencourt that long-term employees who "are still here

all this time" were "deadwood".  However, as detailed in the Response to Plaintiff's

---

[18]Without wishing to appear callous, as a legal matter no employer ever needs to forego selecting the more senior employee for termination as long as the selection is not for independent age related reasons.  Legal considerations aside, those affected by the non-consideration of seniority have a plausible claim that the failure to consider their seniority is unfair if the Company has previously profited by the employees' past service, and then disregards it when effectuating a layoff.  Here, however, while for benefits Callaway honored the employees' past service (despite the so-called seniority or age bias), no employee worked for Defendant longer than any other.  Moreover, despite the Plaintiff's praise for the employees of the prior company, the fact is that the company lost millions of dollars and was forced into bankruptcy after selling off much of its business.  That kind of recent history does not create much incentive for the purchaser to attempt to retain employees of the prior company.

Statement of Disputed Facts, the affidavit Plaintiff relies upon does not assert that, but rather, that Mr. Kelleher "complained about long term employees who 'are still here all this time' and are 'deadwood'".  (Response ¶ 30)  Even if Kelleher thought all long-term employees were deadwood, for the reasons cited in Hazen, such a belief would not support an assertion that such a belief was discriminatory based on age.  But clearly, here the complaint was about people there a long time and were deadwood.  Not only does that not indicate the perception that he thought employees were deadwood if they were long service employees, the materials before the court show that Kelleher expressly told Bettencourt (who was with the company a very long time) that he did not think Bettencourt was deadwood.  (Id.)

Similarly, while Bosworth is alleged to have referred to the field sales force as having a lot of dead weight (See Defendant's Response to Plaintiff's Statement of Disputed Facts at ¶¶ 12-16)[19], that, too, is not an age related comment, especially in the context of a failing company.  See, e.g., Gartland v. Hermetic Seal Corp., 1990 WL 127529, *2 (D. Mass., 1990) ("Plaintiff further charges that Wong said at one staff meeting, in the context of discussing the reorganization of the sales team, that "we should get bright young people in," and on another occasion that he wanted to "get rid of deadwood."  In the context of a company, which admittedly is in the throes of serious financial difficulties, these statements, even if considered collectively, do not suggest that the election of plaintiff for termination was discriminatory.").  Accord, Strickland v.

---

[19]Again, the Plaintiff's claim that indicates he referred to all the existing employees in such fashion was not supported by his own materials, and discussed in the Defendant's Response to Plaintiff's Statement of Disputed Facts.  Bosworth was also said to have said that "people who had been there over 20 years were "bleeding the company dry."  This, too, relates to an employee's longevity, not age.  What was and was not stated by Bosworth, as supported by the materials submitted by Plaintiff, are dealt with in Defendant's response at length.

<u>Federal Express Corp.</u>, 45 Fed. Appx. 421, 425, 2002 WL 2026385, **4 (6th Cir. 2002) ("Deadwood" likely refers to people who just are not working hard."); <u>Long v. Chesapeake and Ohio Ry. Co.</u>, 42 FEP Cases 990, 998 (E.D. Va. 1986) *aff'd*. w/o op., 825 F.2d 407 (4th Cir. 1987) (employees' allegations that union officers referred to them as "old women," "dead wood," "deteriorating" and "stagnant" held insufficient to establish that union acted with age-based motivation).

Straining further, in Orwellian fashion Plaintiff asserts that a pervasive corporate mindset of age bias is further demonstrated by the testimony of Richard Levandowski. The testimony relates to the finance department's periodically reviewing the costs associated with Defendant's relatively high absenteeism amongst its hourly workforce. Not only did this testimony not pertain to office employees, the testimony clearly indicates that the Company simply concluded that its higher costs was a result of the fact that the Company had an older hourly workforce, that such higher costs were simply a cost of doing business, and that no action was therefore appropriate. Indeed, there isn't even a claim that any action was ever taken to reduce such age related costs, or to lower the ages in the factory. The age of the workforce may be noted as the explanation for a higher than expected operating cost without leading to the conclusion that doing so is indicative of age bias in general, or that the termination of people outside the area even being studied was age related. <u>Cf</u>. <u>Dartt v. Browning-Ferris Industries, Inc.</u>, (Mass.) 427 Mass. 1, 5, 691 N.E.2d 526, 529 (Mass., 1998) (evidence of employer attempts to contain or reduce workers' compensation claims not probative of handicap discrimination).

Similarly, generic references to the "old regime" or an employee being stuck in the "old ways" simply have no relevance.  Thus, in daily speech, few people properly use the term "former" rather than simply saying old.  Undoubtedly when the new federal courthouse opens most people will refer to the present building as the "old" federal courthouse, despite its relatively recent vintage.  Such comments fall far short of establishing that the speaker had any age bias, much less that it infected the entire company.  *See, e.g.,* Moreno Morales v. ICI Paints, Inc., 383 F. Supp. 2d 304, 316 (D. Puerto Rico, 2005) (summary judgment in ADEA case although employee told she was associated with the "old administration" and specifically referred to me as part of the 'old team' that could not learn new things.); Gartland v. Hermetic Seal Corp., 1990 WL 127529, *2 (D. Mass., 1990) (fact that several managers called plaintiff "the old man" at social events and occasionally at business meetings during the period of his employment does not, without more, suggest that the company is guilty of age discrimination.); Gagne v. Northwestern National Insurance Co., 881 F.2d 309, 315-16 (6th Cir. 1989) (affirmed summary judgment when a manager said that "he needed younger blood" in the company, as it was ambiguous as to whether the defendant meant younger in terms of time at the firm or younger in terms of age.").  The comments here, at a minimum, "are readily susceptible to interpretations which are in no sense discriminatory".  The house of cards Plaintiff attempts to build on them tumbles accordingly.

## C. <u>The Terminations of Richardson & Gielow Don't Show Corporate Age Bias</u>

The undisputed evidence demonstrates that since September 2003, in light of the consolidation of corporate operations in California, literally hundreds of salaried employees have been terminated.  Plaintiff seeks to bolster his case by the testimony of two of these employees, David Richardson and Richard Gielow, who worked as Sales Managers.  They worked in different positions, and were terminated at different times by a Vice-President who was not even employed by Defendant when the April layoffs were announced.  To this end each has indicated that he was in the protected age bracket, indicated that he was terminated, and has at least raised a dispute as to his performance at the time of their individual termination.[20]

Clearly, the evidence, which at most goes to Bosworth's mindset, would be inadmissible and irrelevant to show that other decision makers were biased based on age.  Moreover, such testimony should not be allowed in the case of Paul Duval either, since the obvious factual disputes regarding the reasons for their separation would require mini-trials regarding the separation of two other employees.  (*See* Defendant's Opposition to Plaintiff's Statement of Disputed Facts)[21]

---

[20]Each claims to be the "top performer."  As noted in the Response to Plaintiff's Statement of Disputed Facts, such a claim is vague and, in any event, unsupported.  However, Bosworth testified that he did not think either were good employees.  At his deposition Vaughn Rist testified that Richardson was a good salesman, but had not performed well as manager.  Richardson claims that Rist told him otherwise.  These disputes would have to be resolved by the jury if their testimony could have any relevance even as to Paul Duval, terminated by Bosworth.

[21]In its opposition, Defendant noted that although Richardson had not pursued a claim, there is apparently a dispute over their performance, and the reasons for their termination.  As noted there:  "While actual evidence of a corporate mindset of age bias evidenced by the termination of others may be relevant, the mere discharge of an older employee, or even several older workers, whose performance is contested, would not be relevant to establish such

Indeed, efforts to prove that their layoff in a reduction of force was age based by citing such testimony, was attempted but clearly rejected by the First Circuit in Goldman v. First National Bank of Boston, 985 F.2d 1113, 1119 (1st Cir. 1993) ("First, Goldman claims that discriminatory animus is inferable from the affidavits of eight former Bank employees, each stating that the affiant was the eldest, or one of the eldest, employees in a particular unit at the Bank and was performing adequately when dismissed pursuant to the reduction in force. According to Goldman, the fact that several older, long-term employees with satisfactory performance records were terminated could lead a reasonable factfinder to conclude that Goldman would not have been terminated but

a discriminatory corporate mindset, absent a preliminary finding that there was age discrimination in the termination of Mr. Richardson. Thus, the mere termination of Mr. Richardson when there in fact was a consolidation of sales territories (especially given the literally hundreds of people terminated during this period and the absence of any statistical evidence showing a disproportionate number of older workers being fired), by itself, does not establish age bias by Bosworth much less bias on a corporate-wide basis. If Richardson's testimony was to the effect that he was told he was being fired due to his age, at least a *bona fide* argument could be made that he should be allowed to testify about his own termination because, that evidence, if credited, would show a bias at least by Bosworth. However, there is no such evidence offered, merely circumstantial evidence from which Richardson, had he pursued a legal claim, could attempt to convince a jury that an inference of age discrimination could be drawn. Thus, the evidence is that Richardson was doing a good job and was fired nonetheless does not compel a finding of age bias. The Company would, of course, be required to rebut any such attempted inference, and present its evidence of Richardson's performance, the changes in the Sales Territories, etc., in an effort to demonstrate that Richardson's departure was not indicative of age bias. This would, of course, have to be allowed, since if, but only if, the circumstantial evidence relating to Richardson's departure led the jury to first conclude that Richardson's termination evidenced age discrimination, could there even be a plausible assertion that the biases evidenced by Richardson's termination also tainted the decision relating to Paul Duval. The jury would therefore be subjected to a trial within a trial relating to the consolidation of the outside Sales Force (which included none of the Plaintiffs) in general, and the specific reasons why Richardson was selected as part of the consolidation, all before it could even begin to assess if unlawful motivation caused Richardson's termination. Only after engaging in that exercise could they determine if the same motivation also tainted the decision to terminate Duval. "Allowing such evidence would be prejudicial "forcing [Defendant] to respond to each witness's claims, and creating, in effect, several "trials within a trial." Wyvill v. United Companies Life Ins. Co., 212 F.3d 296, 303 (5th Cir. 2000) *cf.* Goldman v. First Nat'l Bank, 985 F.2d 1113, 1119 (1st Cir. 1993) (anecdotal evidence did not give rise to reasonable inferences supporting plaintiff's claim of age discrimination.)".

for his age.  On the contrary, as the district court observed, anecdotal evidence of this sort does little more than "corroborate what was undisputed:  that members of the protected class were terminated as part of the [reduction in force]."  Evidence that eight employees, among the 119 selected for dismissal, were among the eldest in their respective units does not give rise to a reasonable inference that older employees were disproportionately affected by the reduction in force, much less that age discrimination motivated their dismissal.").  The court, both at trial and at this stage should not be diverted into a mini-trial over the separation of two other individuals, amongst hundreds, when those individuals never pursued any claim of age discrimination, and have no evidence that there own terminations were age related, other than their own circumstantial claims.  To say such limited evidence has independent relevance, notwithstanding the absence of statistical evidence of a pattern of age discrimination in the layoffs, would be prejudicial, unfair, and unjustified.[22]

### D.  Plaintiff's Argument Against Partial Summary Judgment is Specious

Plaintiff's argument against partial summary judgment boils down to the fact that he asserts that the Company was mismanaged, and if not, it may still be operating as it was.  Thus, he asserts, "no one knows what would have happened in 2005 if the Company had not declined and if so many experienced and successful employees had not been terminated."  However, it is not, and will not be, the role of the jury in this case to decide if the Company was well managed.  It is not, and will not be, the role of the jury in this case, to engage in wild speculation as to whether the alternative universe

---

[22]While such matters are often not actually decided until a motion in limine, it would be counterproductive to allow the case to go to trial based, even in part, on evidence that should be precluded.  Of course, summary judgment here would be appropriate even if testimony of these individuals were considered.

might exist if this cost accountant rather than that cost accountant was retained.  Partial summary judgment is appropriate when, as here, the facts show that liability would have ceased at some point for non-discriminatory reasons.

There is no claim here that any of the entrepreneurial decisions made by Callaway, including its decision to cease operating TFGC as a stand alone unit, and assume responsibility for the Finance and Sales functions in California, was discriminatory or even, in a rational sense, the natural consequence of a discriminatory decision.  Rather, this case involves the termination of a single individual, (four counting the related cases, two cost accountants, a sales planner, and a logistic manager, who claim that they should not have been laid off when they were).  Plaintiff cannot plausibly argue to the court or to a jury that the managerial decisions that make partial summary judgment appropriate, decisions prompted by the continuing losses of millions of dollars and a change in the CEO of Callaway itself, would not have occurred if only he were not laid off when he was.  Similarly, the claim that "in an age neutral environment" where qualifications and performance were judged fairly, it may well have been appropriate to continue to offer positions to plaintiffs in California or elsewhere" is, to be blunt, poppycock.  There is no legal requirement to do so, and no basis for any assertion that although their purported replacement was terminated (and not offered a position in California or elsewhere), their employment with Defendant would have continued.

### E.  The Release Is Effective

Plaintiff notes that many of the cases cited by the Defendant are federal cases. However, even those cases (and there are several state law cases as well) holding that OWBPA is limited, decide the underlying release issues based on state law.  To the

25

previous list Defendant would add, Stonkus v. City of Brockton School Dept., 322 F.3d 97, 103 (1st Cir. 2003) (holding that effective release of M.G.L. c. 151B claim did not need to satisfy requirements of the Older Worker Benefit Protection Act, stating "her age discrimination claim is pursuant to Mass. Gen. Laws. ch. 151B, which requires none of the pertinent elements of section 626(f)(1)."  Further, the fact that the earlier memorandum correctly cites state law on tender back, the Defendant cites Hartlage v, Town of Cohassett, 51 Mass. App. Ct. 1104, 744 N.E.2d 683, 2001 WL 278007 (Mass. App. Ct.) (an unpublished decision of the Appeals Court finding OWBPA inapplicable to c. 151B claim, and holding that failure to tender back precluded action even if there was duress.).  Indeed, there is really no *bona fide* argument made that the release was made under duress, or coerced, or that tender back rules are inapplicable.  Indeed, to knowingly release a claim a party need not know every fact that might subsequently come forth during discovery, or such releases would virtually never be enforceable.  Clearly, Plaintiff knew he was in the protected bracket and was being terminated.  He knew he was waiving any claim relating to any federal or state discrimination law relating to termination.  Does Plaintiff contend that the Plaintiff would have better understood the release if, instead, it released claims under M.G.L. c. 151B?  Plaintiff had time to review the agreement with counsel.  There is no basis for not honoring the clear intent of the release.

## Conclusion

As this court has recently noted, "the 'liberality' of the summary judgment standard "does not relieve [him] of the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe."  Mulvihill v. Top-Flite Golf Co., 335

26

F.3d 15, 19 (1st Cir. 2003).  *See also,* Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994) ("When ... defendants invoke Rule 56 and identify a fatal flaw in a plaintiff's case, it becomes the plaintiff's burden to produce specific facts, in suitable evidentiary form, to contradict the flaw's existence and thereby establish the presence of a trialworthy issue."); Medina-Munoz, 896 F.2d at 8 ("The test for summary judgment is steeped in reality.")"; Paren v. Craigie et. al., 2006 WL 1766483 *12 (D. Mass. 2006). Summary judgment is appropriate and should issue.

                                      Respectfully Submitted,


                                      ___/s/ Jay M. Presser_____
                                      Jay M. Presser, Esq.
                                      BBO No. 405760
                                      Counsel for Defendant
                                      Skoler, Abbott & Presser, P.C.
                                      One Monarch Place, Suite 2000
                                      Springfield, Massachusetts  01144
Dated:   February 2, 2007             Tel. (413) 737-4753/Fax: (413) 787-1941

### CERTIFICATE OF SERVICE

        I hereby certify that a true and accurate copy of the foregoing *Defendant's Reply Brief in Opposition to Its Motion for Summary Judgment* was served upon the attorney of record for each other party via electronic filing on February 2, 2007.

                                      ___/s/ Jay M. Presser_____
                                      Jay M. Presser, Esq.